KEASBEY & MATTISON CO. v. AMERICAN MAGNESIA & COVERING CO.

(Circuit Court of Appeals, Third Circuit. January 24, 1906.)

No. 34.

1. PATENTS—ORIGINAL INVENTOR—MACHINE FOR MOLDING PIPE COVERINGS.

Evidence considered, and *held* insufficient to overcome the presumption, arising from the granting of the patent, that the patentee was the original inventor of the machine of the Keasbey patent, No. 397,860, for molding tubes or cylinders for covering steam pipes.

2. SAME—VALIDITY—DESCRIPTION OF MACHINE.

A patent for a machine, described as one for molding tubes or cylinders, is not invalid, because in the use of the machine it makes only half tubes or cylinders capable of being fitted together and so designed.

3. SAME—INFRINGEMENT—MACHINE FOR MOLDING PIPE COVERINGS.

The Keasbey patent, No. 397,860, for a machine for molding tubes or cylinders from plastic material such as are used for covering steam pipes, was not anticipated by anything in the prior molding art, from which the machine of the patent differs essentially, owing to the difference in the materials used and the requirement of uniform density to render the product nonconductive and serviceable for pipe covering, and the patent discloses patentable invention. Claim 1 also *held* infringed.

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania.

For opinion below, see 137 Fed. 602.

Edmund Wetmore, for appellant.

Wm. Houston Kenyon and Alan D. Kenyon, for appellee.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. This suit was brought in the Circuit Court of the United States for the Eastern District of Pennsylvania, in equity, for an injunction, and accounting, and damages, by the appellant, the Keasbey & Mattison Company, a Pennsylvania corporation, against the appellee, the American Magnesia & Covering Company, also a Pennsylvania corporation, for infringement of letters patent No. 397,860, issued to the patentee, Henry G. Keasbey, February 12, 1889, the title to which, by due and legal assignments, was vested in the complainant company.

The patent was for a new and useful improvement in machines for molding tubes or cylinders, and the patentee states the object of his invention to be "the production of an apparatus or machine for forming or molding tubes or cylinders of plastic material, such as are employed for covering steam and like pipes, by which the tubes or cylinders are formed perfectly, rapidly and cheaply." The defenses relied upon in the court below, were:

(1) Non-infringement.

(2) That claims 1, 3, and 5 of the patent in suit (the ones here involved) are invalid, because the combination of these claims is disclosed in the prior art.

(3) That the combination of the patent in suit was an invention of Wilfred S. Griffiths, and not of Henry G. Keasbey, the patentee.

(4) That the apparatus of the patent in suit was in public use two years before the application for a patent.

(5) That in view of the prior art, it required no more than mere mechanical skill, at the date of the alleged invention, to construct the combinations of claims 1, 3 and 5 of the patent in suit.

(6) That claims 1, 3 and 5 are not true combinations, but are mere aggregations, and therefore invalid.

The court below found that the patented device was the invention of Wilfred S. Griffiths, and not of the patentee, Henry G. Keasbey. The court did not, therefore, consider any of the other defenses, but, on the ground stated, entered its decree dismissing the bill with costs.

The questions raised on this appeal by the specifications of error, involve not only the one upon which the court dismissed the bill, but also, the validity of claims 1, 3 and 5 of the patent, and, though the view taken by this court will to some extent render necessary the discussion of those other questions, the action taken by the court below upon the claim that the patented device was the invention of Griffiths, and not of Keasbey, gives to it a dominating importance.

In a short opinion, the learned judge of the court below says:

"If I had enjoyed the advantage of seeing and hearing the witnesses, I should have felt better qualified to judge between the two conflicting accounts that have been presented to the court, but as I have nothing before me except the cold record, I must rely upon the tests of inherent probability and corroboration.     So far as the former test is concerned, there is not much to choose, I think, between the contradictory statements of the rival claimants.     Standing by itself, each account is plausible, and each is susceptible of attack at certain points, as the briefs of counsel have not failed to make clear.     In a position of such perplexity, I have, therefore, felt bound to give considerable weight to the corroborating testimony of several other witnesses, which supports the account of Mr. Griffiths.     *   *   *   The weight of the evidence seems to establish the fact, that the patented device was invented late in the year 1885, by W. S. Griffiths."

From a careful reading of the testimony, as disclosed in the record, we can appreciate the perplexity produced thereby in the mind of the learned judge.   We have, however, reached a different conclusion as to the disposition to be made of the case under the circumstances.   There is undoubtedly a clear and absolute conflict of testimony between Keasbey, the patentee, and W. S. Griffiths, in regard to the main fact of invention of the device of the patent in suit.   It is not disputed that Henry G. Keasbey, the patentee, as manufacturing partner of the firm of Keasbey & Mattison, had conducted experiments, for the purpose of devising an apparatus for molding pipe and boiler covering of magnesia, asbestos and water, prior to any relation of Wilfred S. Griffiths thereto.   Keasbey testifies that his attention was called to devices for molding tubes or cylinders, in November 1885, by the purchase from their firm, by a man named Hanmore, of large quantities of carbonate of magnesia, and that it was discovered that Hanmore was using it for steam pipes, for the prevention of radiation of heat; that Hanmore afterwards told him, that if the covering for application to steam pipes, composed of carbonate of magnesia and asbestos paper, could be molded successfully into sectional covering, there would be a large demand for it; that Hanmore then showed Keasbey a small tin mold, which he had with him, and a short half section of pipe covering about six inches in length.   Keasbey then returned to Ambler, and had a tin mold made, and molded one or two sections of covering with it.   As the tin inclosure prevented evaporation, Keasbey testifies that he had a mold made of brass wire gauze (of which he makes an exhibit), lined it with muslin, filled it with the Hanmore composition, and dried it in an oven in the analytical department of his establishment, which was heated by steam; that, owing to the open character of the mold, the water easily evaporated, and in a very short time the contents were turned out on a plane dry surface, until the drying was completed; that he molded in this way several sections of a suitable size, to cover a half inch pipe, and applied it to the pipes then in use in the laboratory.   Satisfied by his experiments, that it was possible to successfully mold the Hanmore composition into sectional coverings, Keasbey then determined to begin the development and perfection of an invention suitable for the purpose.   He testifies that the day following the finishing of the half inch coverings, he took them from the steam pipes, to which they had been applied, and started across to Wilfred S. Griffiths' office (Grif-

fiths being the superintendent of the works, under Keasbey & Mattison), to show them to him, and give him directions with regard to starting work on the invention he had in view. He met Griffiths coming out of his office, showed him the half sections, and explained that he wished to have some machine and smith work done for the apparatus he had in mind; that this was the first time Wilfred S. Griffiths ever heard or knew of magnesia sectional covering. Keasbey then describes, in detail and at great length, the form of mold which he directed Griffiths to have made for experimental purposes, and relates all of the steps and all of the difficulties which he encountered during his experiments, and how he overcame them.

This summary by counsel for appellant, of Keasbey's testimony, though entirely correct, does not convey to the mind in full, the impression made by Keasbey's testimony when read in extenso. Its coherence and intelligent handling of the subject-matter of the inquiry, bespeak a trained mind, and one familiar with the discussion of mechanical operations and devices. In the course of his testimony, Keasbey produced a series of drawings, some 12 in number, illustrating the successive steps in the development of the invention as claimed by him. It is true, that all but four of these drawings were recently made, presumably for the purposes of the suit. They were, however, made while he was in England, away from his office and papers, a fact which speaks forcibly of his thorough acquaintance with the subject of the patent, and makes it impossible to believe that, if his testimony is in fact untrue, its untruth could be the result of anything but deliberate purpose and intent. If his testimony is true, his claim to the invention described in the patent is established and unassailable. No attempt is made directly to impeach Keasbey's general character, or his character for honesty and veracity, but we are asked, upon the testimony of Griffiths, to disbelieve all that he has said, and to accord to Griffiths absolute credence in the truth of his story, as to his having invented the device of the patent in suit.

Griffiths' story is, in brief, that he was superintendent of the factory of Keasbey & Mattison, and that after Mr. Keasbey became interested in the manufacture of magnesia pipe and boiler covering, at Ambler, Pennsylvania, and had unsuccessfully attempted to make samples of molded magnesia sectional pipe covering, Griffiths, discovering that he was so engaged, said to him: "I will show you how to make pipe covering out of magnesia"—and, leaving him, immediately set about making a suitable mold out of yellow pine wood, being a half cylinder or circle, covered with a flat top lid, to which was attached a core of the form of a half cylinder. This mold, with core and lid attached, were bolted together, furnished with a head and tail piece, with side rods and swinging movement, and to the head piece was attached a pipe, and to this pipe an ordinary hand force pump. He says:

"I then prepared the proper mixture of magnesia, asbestos and water, after I had changed the valves in the pump just mentioned, so as to permit of the successful pumping of this asbestos mixture without clogging the valves of the pump. When this apparatus was ready, I forced the magnesia and asbestos fibre mixture into the mold of the apparatus, which I just described, and immediately and at once, produced a half section of magnesia

pipe covering, of a size suitable to fit two inch pipe, whereupon I showed the section of pipe covering thus produced, to Mr. Keasbey, and, as I handed it to him, he said: 'That is exactly the thing we want.' We carried it into one of the drying rooms on a flat wooden tray, and he, Mr. Keasbey, then went with me to see the apparatus which I have just described, in which this first section of magnesia pipe covering was molded. I explained to Mr. Keasbey how it was operated, and immediately made more sections of pipe covering in it, and continued to make more thereafter, almost daily, until quite large quantities had been produced. Mr. Keasbey, as soon as he saw the first section of pipe covering which I had produced in the apparatus just described, immediately discontinued his efforts to mold plastic magnesia and asbestos fibre in a tin mold."

This is the important part of Griffiths' testimony, and, as is apparent, flatly contradicts that of Mr. Keasbey. His cross-examination shows some significant failures of memory, as to the parts and dimensions of this apparatus which he has thus generally described. But we do not propose to follow, or reproduce, or further allude to, the effects of this cross-examination. It suffices to say, that it does not serve to strengthen Griffiths' testimony. As the court below evidently relies upon the so-called corroborating testimony produced by the appellee, in support of Griffiths' testimony, the same has received our careful attention. Six or seven employés of Keasbey & Mattison, during the time in which Griffiths says he was occupied in devising the apparatus described in the patent in suit, testify as to seeing Griffiths engaged upon making the parts of the molds constituting this apparatus. There is the evident bias of a strong partisanship in the testimony of all of these witnesses. Some of them had been out of the employ of Keasbey & Mattison for 14 or 15 years. Several of them were only 14 or 15 years old at the time of which they were testifying. As to all of them, the interval between the happenings testified to and the time of giving testimony was 17 or 18 years. The purport of the testimony of most of them, so far as they testify to matters of fact, was that they had seen Griffiths occupied in constructing parts of the apparatus, or experimenting in its operation, and most of them, if not all of them, testify, when asked who invented the pipe covering apparatus which they saw Mr. Griffiths with, answer unhesitatingly that Mr. Griffiths was the inventor, or that the understanding was that Mr. Griffiths was the inventor. Whether Mr. Griffiths told them that he was the inventor, or whether they gathered from him the understanding that he was, does not appear. This testimony of opinion, of course, is of little value. We may conceive, that the witnesses were all honest in stating their belief and understanding, as to Griffiths being the inventor. This understanding could easily have been derived, and probably was derived, so far as the testimony shows, from the mere fact of seeing Mr. Griffiths alone at work upon the molds, or experimenting with the apparatus, without having seen Mr. Keasbey in connection therewith, or without having heard the instructions which, Keasbey testifies, he gave to Griffiths, to construct these molds and make these experiments. Here, as is often the case where human testimony is to be weighed, or its conflict reconciled or accounted for, it is important to consider what effect the determination, one way or the other, will have on our estimate of the honesty and character of the conflicting witnesses.

As we have said before, Keasbey's character is unimpeached, and his testimony unassailed, except by the contradiction of Griffiths. The record places him before us as a man of intelligence and dignity, and as one possessing a mind trained in the consideration of mechanical problems. He was shown to have been the inventor and the patentee in more than one patent, besides the patent in suit. He has not only sworn in the application for his patent, but also, upon the witness stand in this suit, that he is the inventor of the device here in question. He has explained how he came to conceive the idea which he afterwards developed, and the successive steps in its development, with a particularity as to time, place and circumstances, which excludes any possibility of innocent mistakes, if he has misrepresented any of them. If Griffiths is right in his belief that he was the inventor, and that Keasbey derived from him the happy thought out of which the invention in question sprang, Keasbey has sworn falsely and stands before us as a perjurer. On the other hand, it may well be conceived, that a bright, self-centered and vain man could have persuaded himself that, in carrying out the instructions given him by Keasbey, he was really entitled to the credit of inventing the machine that he was contriving, and that the mechanical assistance given to Keasbey, in developing his invention, was the most important part of the invention itself. The workmen, also, who saw him thus engaged upon the tasks set him by Keasbey, or assisted him in its mechanical execution, may well have conceived the idea (of which Griffiths probably did nothing to disabuse their minds), that Griffiths was the inventor of the machine which he was contriving, and of the process with which he was experimenting. This consideration is of controlling force, in determining, in a case like the present, the relative weight of conflicting testimony.

There are also other matters of great significance, which bear upon the question now before us. Mr. Griffiths had testified that Mr. Keasbey had never claimed that he had made or suggested this apparatus, or any feature of it, or that any part of it was his own idea. "Q. 83. Either then or at any other time? A. At no time did Mr. Keasbey ever make such a claim or representation to me, and I never even knew the apparatus had been patented until after I left their employ in 1891."

Mr. Keasbey's attention was afterwards called to this testimony of Griffiths, and asked whether it was true. We quote from the record his answer:

"A. It is not true; at least six months before, and probably nine months, before I placed the details of my invention in the hands of my patent attorneys to draw up the application, I informed Mr. Griffiths of my intention to apply for a patent, and in the interval, I spoke to Mr. Griffiths probably twenty times of my intention to apply for a patent, and when the time had arrived to prepare for the application, I went to Mr. Griffiths, and I told him that the time had arrived, and went over the blue prints of the drawings for this machine; blue prints which showed the details of its construction, and had made other drawings of the apparatus, showing it assembled or in its entirety. These last drawings were made in the regular drawing room or drafting room of our works, which drawing room or drafting room adjoined Mr. Griffiths' office, and Mr. Griffiths knew perfectly what

those drawings were being made for, and they were under his eye frequently, and I feel confident that he assisted and made part of those drawings himself. When I had placed the matter in the hands of my patent attorneys, in fact on the very day that I placed those drawings with them, I told Mr. Griffiths that I had done so, and when the application went to the Department, I again told him that it had gone to Washington, and when the patent was granted, Mr. Griffiths knew from me that the patent had been allowed and we have talked it over many times together. During our many conversations previous to the application for the patent, when we were discussing the question, Mr. Griffiths never once, by word or in any manner, shape or form, intimated to me that he had any claim to the invention as a whole, or in part. Had Mr. Griffiths been able to claim any part of this invention, or all of it, I should have recognized his claim, without his having to speak about it. There was no reason for any concealment on my part of these facts from Mr. Griffiths or any one else."

This statement of Mr. Keasbey is clear, straightforward, and unequivocal. It is either true or willfully false, and it is not without special significance to note, that when Mr. Griffiths is asked, on cross-examination, whether Mr. Keasbey, Dr. Mattison, or any other person informed him before he left the employ of Keasbey & Mattison, that Henry G. Keasbey, of Ambler, had had granted to him a patent for the machine in question, he answered, "To the best of my recollection, I never received such information from anybody"; and when the question was again asked, but limited to Mr. Keasbey, he answered, "To the best of my knowledge and recollection, he never did." This will not do as an answer to the unequivocal testimony of Keasbey, which, it seems to us, must, under these circumstances, in accordance with well settled rules of evidence, be taken as true, and if so, we have Griffiths fully informed as to Keasbey's intention to apply for a patent, of his application therefor, and of the fact that it had been issued to him without any protest or claim on his part, that he, and not Keasbey, was the true inventor of the patented device. This testimony, then, is properly of great importance in determining the weight of the evidence on one side or the other. Upon this crucial question, there is no corroboration, either way, and Keasbey's testimony in this respect stands uncontradicted by any testimony sufficient for that purpose.

We have hitherto considered merely the credibility of the testimony, under the circumstances disclosed in the record. We have now to allude to a most important factor in determining the weight of evidence, a factor which seems to us to have been overlooked by the learned judge of the court below. It is, that the burden of proof is on the one who disputes it, to repel the presumption of originality arising from the patent. This is a well established rule of evidence, and is the result of long judicial experience in considering the foundations of belief. In a case like the present, it is not a mere balancing of the weight of testimony on one side or the other, but it is a requirement that this presumption of originality of invention must be overcome by proof which fully satisfies the mind, respecting the fact. Keeping this well settled rule in mind, in considering the evidence in this case, we have no difficulty in finding, that Keasbey's right under the patent to be considered the original inventor of the patented device, has not been successfully assailed by the defendant.

This brings us to the specifications of error that concern the validity of the patent attacked by the defendant, on the alleged ground of want of novelty and anticipation.

As we have seen, the letters patent are declared to be for a machine for molding tubes or cylinders, and the patentee declares, that his invention "has for its object the production of an apparatus or machine for forming or molding tubes or cylinders of plastic material, such as are employed for covering steam and like pipes, by which the tubes or cylinders are formed perfectly, rapidly, and cheaply." The specifications then proceed:

"To attain the desired objects, the invention consists, first, in a given construction of mold for forming the tube; second, in a press of suitable construction for containing the mold; third, in an improved apparatus for feeding the material to the mold; and, finally, in the novel construction, arrangement and adaptation of parts, all as hereinafter described and claimed."

The claims alleged to have been infringed, are the first, third and fifth, and are as follows:

"(1) A machine or apparatus for making plastic tubes, having a press with a mold therein, a reservoir, a supply-pipe leading from said reservoir to said mold, a pumping device for forcing tube material from the said reservoir to said mold, and an air-chamber communicating with said supply-pipe and between the pumping device and the mold, said parts being combined substantially as described."

"(3) In a machine for making plastic tubes, the combination, with the press having the mold arranged in a case therein, of the head and tail pieces closing the ends of the mold, the head-piece being capable of a swinging movement, substantially as and for the purpose described."

"(5) In a machine for making plastic tubes, pipes, or cylinders, the press containing the mold, and the head and tail pieces connected together for closing the ends of the mold, in combination with the feed-pipe provided with a cock or check for supplying material to the mold, substantially as described."

That the device set forth in the patent is useful, is not denied, and is abundantly proved to be so by Griffiths, the defendant's witness, who claims to have invented it, and by the fact that, as we shall see, the defendants have, in its essential features, copied it. It may be admitted at once, that there is no novelty in the general means, by which plastic material is impressed with the form of the molds into which it is poured or introduced. It is common knowledge, that the molding of metals in a fluid state, and of plastic non-metallic material, is one of the oldest of the arts. But on this account, it is not to be said, that the particular apparatus for molding a specified material, the elements of the construction of which are so combined as to produce a new and useful result in the molding art, cannot involve patentable invention. In so old an art, it is not surprising that the defendant has been able to swell the record, by references to patented devices showing its practice in innumerable instances, and for an almost infinite variety of purposes. We may dismiss, therefore, from our consideration, the great number of patents cited, which merely describe the manufacture of pipe or boiler coverings, but claim no special apparatus for molding them.

What is claimed for the apparatus of the patent in suit, is not sim-

ply, that by it, a given desired form can be impressed on the plastic material, consisting of water holding powdered carbonate of magnesia in suspension, through which is distributed fibrous asbestos as a holding material, but that it is so poured into the mold by a constant and even pressure, that uniform density of the residuum, after the squeezing out or draining of the water, is produced; the pressure, by which the water is eliminated and the residuum conformed to the mold, being hydraulic pressure from within, and not mere mechanical pressure from without, the mold press being especially constructed with a view to the draining of the water and to the closing of the ends thereof simultaneously, for the prevention of leakage, by efficient resistance to the hydraulic pressure. Patents for making semi-tubular drain tiles out of clay, which are afterwards baked like earthenware, are clearly not concerned with the essential features of the patent in suit. The patents of Schaffer and Milroy, relied upon by the defendant, are of this type. Each of these describes a mechanical pressure, acting on the dough-like material of the clay. Fluid material cannot be used in them, and they are not adapted to mold material by hydraulic pressure. There are other devices in the function of the machines of this patent, unnecessary now to dwell upon. The same general criticism may be made of the patents for molding many miscellaneous articles, also of those for molding paper pulp by heavy pressure, patents for brick machines, for pressing tobacco into plugs or blocks, and patents for cotton and hay presses. It would extend this opinion to an inordinate length, to discuss these various patents, collected and exhibited to us by the counsel for defendant, and serve no good purpose, as, in our opinion, though all collected from the wide field of the molding art, they are not applicable to the patent in suit. If it is claimed, it has not been shown, that by any of the devices cited could tubes and cylinders of plastic material for covering steam and like pipes, have been made, or that from any of them could be extracted, a plain and easily understood explanation of how an apparatus, such as is described in the patent in suit, could be produced. It is admitted, that the precise machine of the patent in suit did not exist in the prior art, and defendant's witness, Griffiths, claims to have devised it.

But the defendant contends that, however this may be, the device of the patent in suit was a mere adaptation, for the purpose stated, of the filter presses, long in use prior to the date of the patent, and one of which was used by Keasbey & Mattison, in their works at Ambler. These presses consisted of a number of rectangular frames, an inch or two deep, placed in series and connected by an aperture through their centers, through which, by a pump, was forced water, containing carbonate of magnesia in suspension, but without, of course, any asbestos fibre, as the object of the presses was merely to form in the frames, cakes of magnesia, after the water had been drained away, suitable for convenient handling and sale in their original form, or when subdivided into smaller parts. Not only was the form and structure of these presses entirely different from those of the patent in suit, but the object aimed at was entirely different. Special fea-

tures of the apparatus of the patent were designed, and were necessary to produce, not only the cylindrical shape of the sections, but such a uniform density of their substance, as would preserve the cellular structure thereof, necessary to utilize the non-conductivity of the air which permeated it. So also, the lagging machines in use, by which slabs of the same material were molded. These could be built up into approximately arc form, and used as insulators, around the surface of locomotive boilers. These were merely larger cakes, made in the same way as the cakes of the filter presses, but tubes or cylinders for covering steam pipes could not be made upon them. As to these presses, so much relied upon by the defendant as anticipations of the device of the patent in suit, we quote, with approval, the testimony of Mr. Benjamin, the expert witness for the complainant:

"These presses operate by hydraulic pressure exerted in the fluid material which they receive. They represent the state of the art in presses of this general type as it existed prior to the invention of the machine of the patent in suit, and it was upon such machines as this, as I understand, that the machine of the patent in suit directly improves. The necessity for the improvement arose from the fact that none of these old filter presses were competent to make plastic tubes or cylinders, or even to produce pipe and boiler covering capable of meeting commercial requirements. Their object was not so much to produce cakes of plastic material in solid form as it was to extract or filter out the liquid which existed in the plastic material, and, therefore, it was not necessary to see to it that such cakes or blocks as were produced were by reason of their uniformity or general structure competent to serve the purposes of a pipe or boiler covering, or, indeed, any purposes at all.. It appears that the defendant does use, as I understand, the so-called lagging machine illustrated by the model for the purpose of making a covering or lagging; but it is plainly obvious that the defendant does not use that machine to make plastic tubes or cylinders. * * * Nor can I find from the prior art that any one has ever attempted to make tubes or cylinders suitable for boiler covering on this old form of filter press; nor, so far as I am concerned, can I see any way in which it can be done; nor from the record in this case can I find that the defendant has shown any way in which it can be done. Generally, in these old filter presses there is a series of frames, each one of which if filled with solid material determines the shape of the mass. Where the fluid plastic material is forced into these frames successively, passing through apertures in the partitions, it becomes, I think, impossible to produce block which will be of the same density in each frame. As material enters the first frame, it tends to fill it and to obstruct the path of the following material into the next frame, and by the time the material reaches the last frame of the series, it is compelled to force its way through all the accumulations in the preceding frames, with the obvious result that the packing must be greater and the mass rendered more dense, and this progressively in the frames as they approximate the point of entrance of the flow. Commercially this is a very serious objection, because upon the density of the covering, depends greatly its insulating efficiency, and, as I have frequently pointed out, an increase of density which tends to obliterate the air cells on which insulating efficiency depends, as a matter of course, reduces that efficiency and besides involves waste of material. * * * On comparing this old type of press with that of the present patent in suit, I find certain plain structural differences. Thus, as I have said, the machine of the patent in suit can make plastic tubes or cylinders, and the old filter press cannot. Not only that, but it can make plastic tubes and cylinders which will be uniform in their density; or, in other words, for equal thickness will have uniform insulating properties. It is not a press which contains a multiplicity of molds through which the material must be successively forced, or any mold so constructed and arranged as that any material difference in density is possible between different parts of the object produced.

As the apparatus is illustrated in the patent in suit, it is simply one mold into which the fluid material is directly delivered. It is not necessary to take off nuts or slack up tie rods, or go through any such proceedings as is required in the old filter press, in order to get the mold out to put it in. The whole arrangement is such that when the press is opened, the single mold is readily introduced into its proper position, and when the follower is brought down and the head piece forced inward, the joints of the mold are at once tightly closed, so as to prevent any leakage of the fluid material, due to the hydraulic pressure at these points. This removal of the mold in the press of the patent in suit is, therefore, an easy and quick operation, and therefore, even after the feed cock is closed, an interposed air chamber in the supply pipe is abundantly capable of taking care of the delivery of the constantly moving pump during the period of removing, emptying and replacing the mold."

There is no such combination as is described in claims 1, 3 and 5 of the patent in suit, in any of these old filter presses.

The point made by appellee's counsel, that "the patent professes to be for machines for molding tubes and cylinders," and that the devices shown in the patent, are, without change, incapable of making tubes or cylinders, and can only make half tubes or half cylinders, does not appeal to us. An apparatus that molds tubes or cylinders in sections of half tubes or half cylinders, capable of being fitted together, and so designed, is an apparatus for molding tubes or cylinders, as much as if the completed tube or cylinder came from the mold.

In regard to the point made by the defendant, that it required no more than mere mechanical skill, at the time of the alleged invention, to construct the combinations of claims 1, 3 and 5 of the patent in suit, it is perhaps only necessary to say that a careful consideration of the subject has not brought us to this opinion. It was more than a mere advanced step in an old art. There was no prior art of molding tubes or cylinders. The patent was in a certain sense a pioneer patent. To produce from a mold a tube or cylinder of insulating material, cheaply and efficiently, so that the insulating function of the cellular structure should be preserved uniformly throughout the substance of the tube or cylinder, was not an obvious suggestion of the general molding art.

While we are inclined to think that both claims 3 and 5 have been infringed by the defendant, we are of opinion that the evidence clearly shows an infringement of claim 1, as reasonably limited by the qualifying words, "said parts being combined substantially as described." We would so think, even if it were conceded that the old element of an air chamber in the combination described in claim 1, was similarly placed in the old filter presses. That it was so placed, however, we do not think has been shown.

The decree, therefore, of the Circuit Court should be reversed, with costs, and directions given to the Circuit Court to enter its decree, declaring the validity of the patent, and adjudging that claim 1 of said patent has been infringed by the defendant, and in other respects granting the relief in conformity with this opinion.

And it is so ordered.