UNITED STATES, to Use of CREEK NATION, v. REA-READ MILL & ELEVATOR CO. et al.

(Circuit Court, E. D. Oklahoma.   May 8, 1909.)

No. 510.

1. INDIANS (§ 27*)—LANDS—SUIT BY UNITED STATES FOR USE OF TRIBE.

A suit by the United States for the use of the Creek Nation of Indians to cancel patents or deeds to town lots belonging to said nation in its tribal capacity and sold by the United States for its benefit under Act March 1, 1901, c. 676, § 10, 31 Stat. 864, on the ground that such deeds were obtained by fraud for less than the price at which the lots were authorized by such act to be sold, and to recover such lots for the tribe, is within the authority given by Act April 26, 1906, c. 1876, § 18, 34 Stat. 144, which authorizes the Secretary of the Interior to bring suit in the name of the United States for the use of any one of the Five Civilized Tribes "for the collection of any moneys or recovery of any lands claimed by any of said tribes."

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 19; Dec. Dig. § 27.*]

2. COURTS (§ 302*)—JURISDICTION OF FEDERAL COURTS—SUIT BY UNITED STATES FOR USE OF INDIANS—"SUIT IN WHICH UNITED STATES ARE PLAINTIFFS OR PETITIONERS."

Such a suit is one in which "the United States are plaintiffs or petitioners" of which a Circuit Court is given jurisdiction by the federal judiciary (Act March 3, 1875, c. 137, § 1, 18 Stat. 470, as amended by Act Aug. 13, 1888, c. 866, 25 Stat. 434 [U. S. Comp. St. 1901, p. 508]), and in view of the relations between the United States and the Indian tribes, it was competent for Congress to so provide and to give the tribes the status of the United States in the federal courts. The fact that the act expressly conferred jurisdiction of such suits on the United States courts in the Indian Territory did not make such jurisdiction exclusive so as to prevent the bringing of suits thereunder in the Circuit Court after statehood and after the territorial courts had ceased to exist.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 843; Dec. Dig. § 302.*]

3. INDIANS (§ 27*)—LANDS—SUIT BY UNITED STATES FOR BENEFIT OF INDIAN TRIBE—PROSECUTION BY PRIVATE COUNSEL.

In act April 26, 1906, c. 1876, § 18, 34 Stat. 144, to provide for the final disposition of the affairs of the Five Civilized Tribes in the Indian Territory, the provision of section 18 authorizing the Secretary of the Interior to bring suit in the name of the United States for the use of any of such tribes for the collection of any moneys or the recovery of any lands claimed by it, and "to pay from the funds of the tribe interested

---

the costs and necessary expenses incurred in maintaining and prosecuting such suits," is within the power of Congress, and under such authority the Secretary may employ private counsel to conduct such suits; the United States having no interest therein as a suitor. And in any event a defendant in such a suit cannot be heard to object that it was not brought by a law officer of the government.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 19; Dec. Dig. § 27.*]

4. EQUITY (§ 150*)—PLEADING—MULTIFARIOUSNESS.

A bill for the cancellation of a deed to a tract of land for fraud and to recover the land, brought against the parties charged with the fraud, is not multifarious because subsequent grantees of parts of the tract in severalty are joined as defendants on allegations that they bought with knowledge of the fraud; the validity of the original deed in issue being a common point in the litigation, in which all the defendants are interested, and the decision of which may determine the rights of all.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 371–379; Dec. Dig. § 150.*]

In Equity. With this case were heard cases of the same complainant against the Midland Valley Railway Company, A. H. Sharum, and others (No. 7), against H. B. Spaulding and others (No. 9), against C. N. Haskell and others (No. 11), against Frederick B. Severs and others (No. 12), against C. W. Turner and others (No. 14), against B. F. Colley and others (No. 258), against B. F. Colley and others (No. 260), against The Frisco Oil & Gas Company and others (No. 261), against Wm. G. Williamson and others (No. 505), against Fred E. Turner and others (No. 506), against C. W. Turner and others (No. 507), against Chauncey A. Owen and others (No. 508), against The Tulsa Oil & Mining Company, Lynch and others (No. 509), against Mary A. Hogan and others (No. 511), against Fred S. Clinton and others (No. 512), against C. W. Turner and others (No. 513), against J. H. McBirney and others (No. 514), and against Sophia M. Pittman and others (No. 515).

W. L. Sturdevant, Special U. S. Counsel, M. L. Mott, Merritt Eslick, and H. B. Talley, for complainant.

Zevely, Givens & Smith, Hutchings & German, Charles Bagg, Biddison, Campbell & Eagleton, J. J. Henderson, R. W. Kellough, Norman Haskell, C. L. Jackson, C. W. Grimes, Carroll S. Bucher, Sam V. O'Hare, S. B. Dawes, Kuykendall & Martin, Franklin & Tscharner, Roach & Bradley, Jay Farnsworth, Anderson & Anderson, John G. Lieber, Martin & Rice, Charles P. Runyon, Bert E. Nussbaum, Anselam Buchanon, A. F. Schuermeyer, West, Mellette & Jones, Gibson & Ramsey, Edgar A. DeMeules, Carroll & Walker, James B. Diggs, Sleeper & Davidson, Stone, Owen & Fleming, Thomas & Foreman, Magee, Magee & Conner, Bailey & Kistler, E. C. Griesel, B. B. Wheeler, Charles W. Wheeler, Davis & White, Cook & De Graffenried, Benj. Martin, Jr., J. E. Wyand, Butte, Boone & Johnson, E. V. Vernor, J. R. League, Crump, Rogers & Curd, Baker & Purcell, and Randolph & Havre, for defendants.

CAMPBELL, District Judge. In the above causes the United States, as complainant for the use of the Creek Nation, has filed bills

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

against the various defendants to cancel certain patents or deeds to certain town lots in several towns in the Creek Nation, alleging fraud and deception on the part of the defendants in procuring the same. The defendants have demurred. The demurrers have been argued and submitted upon briefs. The bills are substantially the same in each case, and the demurrers set up substantially the same grounds. A brief résumé of the history of the Creek title to the land, out of which these lots were carved, is probably not amiss.

In the early part of the last century the Creek, Cherokee, Chickasaw, Choctaw, and Seminole Tribes of Indians, known as the "Five Civilized Tribes," occupied in their tribal capacity various portions of the states east of the Mississippi river. The growth and development in these then new states had caused the conflict between the advancing civilization of the white man and the habits and customs of these tribes to become more marked. The Indians, as a rule, were not then sufficiently advanced toward the civilization of their white neighbors to adapt themselves to the new order of things, and to merge these tribes into the body politic of the state was found to be impracticable. It was therefore apparent to Congress that some disposition of these Indians must be made. The plan of giving them, in exchange for their lands east of the Mississippi, portions of the public domain west of the Mississippi, where, as it then appeared, they would be undisturbed by the encroachment of white men for years to come, was finally devised, and on May 28, 1830 an act of Congress was passed (Act May 30, 1830, c. 148, 4 Stat. 411) providing that the President might cause the country west of the Mississippi, not within any state or organized territory, and to which the Indian title had been extinguished, to be divided up into districts for the reception of such tribes or nations of Indians who might choose to exchange lands then occupied by them for such districts and remove thereto. This act contained the following provisions:

"Sec. 3. And be it further enacted, that in the making of any such exchange or exchanges, it shall and may be lawful for the President solemnly to assure the tribe or nation with which the exchange is made, that the United States will forever secure and guarantee to them, and their heirs or successors, the country so exchanged with them; and, if they prefer it, that the United States will cause a patent or grant to be made and executed to them for the same; provided, always, that such lands shall revert to the United States, if the Indians become extinct, or abandon the same."

By treaty with the Creek Tribe, entered into at Washington on January 24, 1826 (7 Stat. 286), that tribe, for a monetary consideration, ceded to the United States certain of their lands in Georgia. In this treaty it was further provided that, inasmuch as a portion of these Indians expressed a desire to emigrate west of the Mississippi river, a deputation of five of their number should be sent by them, at the expense of the United States, to examine the available lands west of that river, and select a tract for their new home which the government was to purchase for that purpose. This selection was made. Accordingly, on February 14, 1833 (7 Stat. 417), a treaty was entered into with the said nation, in which it was provided, among other things:

"Art. 3. The United States will grant and patent in fee simple to the Creek Nation of Indians for the land assigned said nation by this treaty or convention, whenever the same shall have been ratified by the President and Senate of the United States, and the right thus guaranteed by the United States shall be continued to said tribe of Indians so long as they shall exist as a nation and continue to occupy the country hereby assigned them."

On August 11, 1852, patent was issued to said tribe in accordance with the terms of the treaty, the granting clause of which reads:

"Now know ye, that the United States of America, in consideration of the premises and in conformity with the above-recited provisions of the treaty aforesaid, have given and granted, and by these presents do give and grant unto the said Muskogee or Creek Tribe of Indians, the tract of country above described, to have and to hold the same unto the said tribe of Indians, so long as they shall exist as a nation and continue to occupy the country hereby conveyed to them."

By this patent title to the land was conveyed to the Creeks as a nation, and no title was vested in severalty in the individual Creek citizens. Cherokee Nation v. Journeycake, 155 U. S. 196, 15 Sup. Ct. 55, 39 L. Ed. 120; Shulthis v. McDougal (C. C.) 162 Fed. 342. But by the usages and customs of the tribe, each individual was entitled to the use and occupancy of a limited portion of the surface of the land for agricultural or grazing purposes, and the inclosures and improvements made for such purpose were permitted to pass by quitclaim deed or bill of sale from one citizen of the tribe to another. As time passed, and railroads were permitted to be built into the Indian Territory from adjoining states, white men came in, and, as a consequence, towns of more or less importance sprang up all over these Indian lands. By common consent of the people, both citizens and noncitizens, these towns resolved themselves into residence and business portions, with distinct lots and blocks, streets, and alleys, of more or less regularity. The possessory right to such lots passed from hand to hand, by quitclaim or bill of sale, and substantial dwellings and business houses were built.

By the act of Congress approved June 28, 1898 (Act June 28, 1898, c. 517, 30 Stat. 495), known as the "Curtis act," provision was made whereby these towns in the Indian Territory could be incorporated and have organized city government. This was the condition confronting Congress, when, on March 1, 1901, it came to deal with the question of allotting the lands of the Creek Nation to the individual members thereof, and providing for the winding up of the tribal affairs. To accomplish this an act was passed by Congress upon that date (Act March 1, 1901, c. 676, 31 Stat. 861), entitled "An act to ratify and confirm an agreement with the Muskogee or Creek Tribe of Indians, and for other purposes," known as the "original Creek agreement," which was shortly thereafter ratified by the Creek Nation.

This agreement authorized the Secretary of the Interior to survey, lay out, and plat the towns in the Creek Nation having a population of 200 or more. It provided for the filing of plats thereof. The Secretary was empowered to appoint a town-site commission of three members, which commission, under his supervision, was to sell the town lots for the benefit of the tribe; such sales to be in conformity

with the plan detailed in the agreement. For the purpose of this sale, the commission was empowered to appraise each lot, and improvements, which appraisement was then to be approved by the Secretary. Certain provisions were made in the agreement whereby persons having procured the right of occupancy of a limited quantity of such town property were given a preference right to purchase the same at less than the appraised value. Among these provisions were the following:

"Any person having the right of occupancy of a residence or business lot, or both, in any town, whether improved or not, and owning no other lot or land therein, shall have the right to purchase such lot by paying one-half of the appraised value thereof.

"Any persons holding lands within a town occupied by him as a home, also any person who had at the time of signing this agreement purchased any lot, tract, or parcel of land from any person in legal possession at the time, shall have the right to purchase the lot embraced in same by paying one-half of the appraised value thereof, not, however, exceeding four acres.

"All town lots not having thereon improvements, other than temporary buildings, fencing, and tillage, the sale or disposition of which is not herein otherwise specifically provided for, shall be sold within twelve months after their appraisement, at public auction to the highest bidder at not less than their appraised value.

"When the appraisement of any town lot is made, upon which any person has improvements as aforesaid, said appraisement commission shall notify him of the amount of said appraisement, and he shall, within sixty days thereafter, make payment of ten per centum of the amount due for the lot, as herein provided, and four months thereafter he shall pay fifteen per centum additional and the remainder of the purchase money in three equal annual installments, without interest."

### Section 31 provides:

"All moneys to be paid to the tribe under any of the provisions of this agreement shall be paid, under the direction of the Secretary of the Interior, into the Treasury of the United States to the credit of the tribe, and an itemized report thereof shall be made monthly to the Secretary of the Interior and to the principal chief."

### Section 34 provides:

"The United States shall pay all expenses incident to the survey, platting, and disposition of town lots, and of allotments of lands made under the provisions of this agreement, except where the town authorities have been or may be duly authorized to survey and plat their respective towns at the expense of such town."

Pursuant to the foregoing agreement, a commission was appointed by the Secretary of the Interior to appraise and sell the lots in various towns in the Creek Nation, among them Tulsa and Muskogee.

The bills in the cases at bar are substantially alike, and allege:

"That the Creek Nation is one of the Five Civilized Tribes of Indians residing in the then Indian Territory, now state of Oklahoma, and now is, and at all the times stated herein was, a ward of the complainant, and that complainant is, and was at the times herein stated, the guardian of said Creek Nation both as to person and as to property, and charged with the duty of enforcing any and all the proper claims relating to the property of said nation; that by virtue of authority vested in him by law, the Secretary of the Interior has caused this suit to be instituted and prosecuted in the name of the United States of America for the use of the Creek Nation on the grounds and for the causes herein alleged, and has duly authorized and empowered the undersigned counsel to act as such in instituting and prosecuting the same."

Reference is then made to the act of May 28, 1830, and the patent to the Creek Nation above referred to, to the communal ownership of the tribe, and to the rights of occupancy and use of distinct portions of the land existing in individual members of the tribe, and the vendibility of such rights to other members by bill of sale or otherwise, the act of Congress providing for the appraisal and sale of town lots and the appointment of a commission for that purpose, and that the appraisal was very low, being in many instances but a small fraction of the value of the lots. They then alleged: That certain of the defendants, either having or claiming to have the right of possession of certain unimproved tracts in said towns in excess of the amount they would be permitted to acquire under the terms of the act at less than the appraised value, and which tracts had been platted into lots and blocks, proceeded to make pretended transfers of the same to other persons for the purpose of reducing individual holdings to the amount within the maximum amount which the act permitted such holder to acquire, with the intention and agreement that the pretended purchasers should retransfer to them after issuance of patent, or to such persons as they should direct. That said defendants procured the necessary payments to be made, and patent issued by the Creek Nation to such pretended purchasers, who thereafter retransferred the same to said defendants, or to such persons as they nominated, thereby enabling said defendants to secure the benefit of more land within said town sites than they were by law entitled to, being land which under the terms of the act should have been sold at public auction to the highest bidder and for not less than its appraised value, thereby defrauding the Creek Nation out of the money it would otherwise have received from the sale of said lots, by securing them at less than the appraised value. It is then alleged that by various transfers these lots in question have finally come into the hands of the present claimants of the property, who are also made defendants herein.

It is also alleged that the defendants now claiming to be the respective owners of said lots acquired the right, title, and interest now claimed by them with full knowledge, actual and constructive, of the fraudulent manner in which the lots were scheduled and the deeds thereto procured, and that the consideration, if any, paid by them for said lots, was paid with full knowledge of the facts. It is further alleged that neither complainant nor the Creek Nation had any knowledge of the fraudulent manner in which the said lots were scheduled, and the deeds thereto procured, at the time of the execution and approval thereof, nor subsequent thereto, until immediately before the filing of these suits.

The complainant prays that patents issued for these lots, and all subsequent conveyances be canceled, and the title decreed to be in the nation; or, in event that cannot be done, that the complainant have judgment for the value of said lots against the defendants alleged to have fraudulently procured the deeds therefor, and all other defendants named in the bill who may be adjudged on the hearing to have participated in the alleged fraudulent transactions.

To these bills the various defendants have severally demurred. The principal grounds of demurrer alleged are the following: First, that the complainant has no legal capacity to sue; second, that the court has no jurisdiction over the parties or subject-matter; third, that the bills are multifarious; fourth, that there is a misjoinder of parties and causes of action; fifth, that the bills are without equity. Other minor grounds are urged in some of the demurrers; but in my opinion, unless the demurrer can be sustained on some one or more of the foregoing grounds, they must fail. It is also urged that, if these actions can be maintained at all, they can only be prosecuted under the direction of the Attorney General, acting through the District Attorney, or some other officer of the Department of Justice authorized to conduct the litigation.

By settled rules of pleading these demurrers, for the purpose of the present consideration, admit the truth of the allegations in the bills. Conceding that, are they subject to the objections raised? Section 2 of article 3 of the Constitution of the United States provides that the judicial power shall extend to controversies to which the United States shall be a party. By the act of Congress of 1887–88 (Act Aug. 13, 1888, c. 866, 25 Stat. 434), it is provided that Circuit Courts of the United States shall have original cognizance of all suits of a civil nature at common law or in equity in which controversy the United States appear as plaintiffs, or petitioners. In this case the United States appear as plaintiffs. Therefore, if it shall be made to appear that the United States have capacity to sue herein, and are real and not merely nominal parties plaintiff, it follows that this court has jurisdiction. The first two grounds of the demurrer above referred to may therefore be considered together.

The land involved in these suits was tribal land, and the interest urged in behalf of the Indians is their tribal interest, and not their individual interest as allottees. The question of the relation of the United States to the allottee, with regard to lands allotted and patented to him in severalty, is not involved in this case, and in my opinion presents a very different proposition. It is argued that the members of the Creek Nation are now citizens of the United States, and hence the government cannot maintain these actions. In suits involving allotments, this argument is worthy of most serious consideration; but I cannot agree that the present status of the individual Indian with regard to citizenship in any way affects this case. They have no separate individual interest in the property involved, and it is a tribal and not an individual matter. At the time the agreement of 1901 was entered into, the Indians composing the Creek Tribe, like those of all other tribes, were treated as the wards of the United States, in a state of pupilage and dependency (Stephens v. Cherokee Nation, 174 U. S. 483, 19 Sup. Ct. 722, 43 L. Ed. 1041), and they were still, as a tribe, under the parental care of the United States guaranteed to them by the treaties. The power existed in the United States to administer upon the property of the tribe. Cherokee Nation v. Hitchcock, 187 U. S. 308, 23 Sup. Ct. 115, 17 L. Ed. 183. Congress had determined that the tribal condition and the status of the title to the lands which had prevailed ever

since the original treaty and patent should be changed, and hence the agreement.

It must be borne in mind that the agreement above quoted did more than merely provide for the disposition of the town sites. It also provided for the allotment in severalty of the lands of the tribe, other than town sites, to the individual members of the tribe. This was to be accomplished by the individual members selecting their respective allotments, for which they were to later secure patents signed by the principal chief and approved by the Secretary of the Interior, passing to them in severalty the tribal title and all interest of the United States; but these town sites were to be segregated from the allotted lands, were not subject to allotment, and by agreement with the tribe the United States undertook to dispose of the same for the use and benefit of the tribe. This was a proper subject of agreement with the tribe. In fact, it was in keeping with the uniform policy of the government in its attitude of superintendence and parental care over these and all Indian tribes in matters involving their property rights, where noncitizens were concerned. The Secretary of the Interior was empowered to direct and supervise all the public business relating to the Indians. U. S. Comp. St. 1901, p. 252. Without the agreement of Congress, the tribe could only hold the lands as tribal lands, for by the terms of their patent they could not dispose of the land without congressional assent, and it inured to them only so long as they continued as a tribe to occupy the same. In disposing of these town sites there was not only the interest of the tribe and the interest of the United States to be considered, but there were the further interests of individuals, most of them white men and noncitizens of the tribe, who by invitation of the tribe, or, at any rate, by sufferance of the tribe and the United States, had settled in these towns, procuring from the Indians certain possessory rights of occupancy of lots or parcels of lands within such town, made valuable improvements thereon in good faith, and it became the policy of Congress to protect them.

It was but natural therefore that the United States, in view of their unquestioned right to administer upon this vast Indian estate, and superintend its division among the individual members of the tribe, should undertake to manage the disposition of these town sites, adjusting the extensive and varied interests involved, receiving and holding the moneys realized for the sale of lots, to be accounted for to the tribe later. The terms of the agreement, we have noted, were very explicit as to the appraisement and scheduling of the property to persons in possession, the percentage of the appraised value they were to pay under the varying circumstances, etc. The Secretary of the Interior, as the representative of the United States, was required to follow these provisions in disposing of the lots. As the representative of the United States, the duty and obligation clearly devolved upon him to dispose of the lots in the manner provided by the agreement, and to secure as proceeds therefrom, for the benefit of the tribe, the full amount to be realized in strict accordance with its terms. The commission provided for by the act for the appraising and scheduling of the lots was appointed by the Secretary, represented him and the

United States in the matter, and the Secretary and the commission were merely the agencies through which the United States acted in carrying out the provisions of the agreement. It will be remembered that the agreement contained this provision:

"That any person who had at the time of the signing of said agreement purchased any lot from any person in legal possession at the time, should have the right to purchase the same at one-half the appraised value thereof, not however, exceeding four acres."

Did the transactions recited result in the United States realizing for the tribe any less for the property than would have been realized had it been disposed of in accordance with the terms of the agreement?

The lots in controversy, the bill alleges, comprise an unimproved tract of land. The defendant or defendants in each bill, who claimed the right of occupancy of the same, were only entitled to take not exceeding four acres at one-half the appraised value. The lots in said tract in excess of four acres were, by section 14 of the agreement, to be sold under the direction of the Secretary of the Interior at not less than their appraised value. It is readily seen therefore that, had this been done, the Creek Nation would have realized not less than the full appraised value from all the lots carved out of such tract in excess of four acres. If then, as alleged in the bills, the defendant or defendants, who claimed the right of occupancy in each case, secured these lots in excess of four acres at one-half their appraised value, it is clear that the Creek Nation was deprived of proceeds to which it was entitled to the extent at least of one-half such appraised value, if the United States, in accounting therefor, only pay to it the amount actually received for said lots. When the United States undertook by said agreement to manage the disposition of the town sites, they impliedly, if not expressly, undertook to secure for the Creek Nation in return therefor the full amount which could be realized for the sale of the same, in strict accordance with the terms of the agreement. They are obligated to the Creek Nation to do so. Taking the allegations of the bill as true, which for the purpose of this demurrer must be done, it follows that the terms of the law have been violated, and the defendants who evolved the plans set out in the bills have wrongfully secured the property of the Creek Nation.

The United States government in taking charge of these town sites and selling them and collecting the money therefor, to be held and later paid to the Indians, was but discharging a duty imposed by the peculiar relations existing between the Indians and the government, and which had given rise to the agreement. The agreement provided that blank deeds should be furnished by the Secretary to the principal chief, whose duty it was to execute deeds to all persons to whom lots were scheduled, and for which payments had been made into the Treasury of the United States. The law further provided that all conveyances should be approved by the Secretary of the Interior, which should serve as a relinquishment to the grantee of all the right. title, and interest of the United States in and to the lands embraced in such deed. Certainly if, as alleged in the bills, the Secretary is

imposed upon and induced to direct the principal chief to execute a deed and to himself approve the same, for a consideration less than the law provided for, and thus the illegal issuance of a deed is secured, the United States government, which the Secretary represents, has such an interest in the matter as entitled it to maintain an action to have the fraudulent transaction set aside. Having undertaken on behalf of these Indians to sell these town lots in a certain manner, and for a certain consideration, the United States is under obligations to the Indians to so dispose of them. There can be no doubt that, when the original agreement was made, the relation of the United States to the Creek Tribe was such that, whether they be termed "guardian," "protector," or whatsoever term may be applied, they could and did assume the duty of disposing of the town sites for the benefit of the tribe as a part of the national plan in finally disposing of the affairs of the tribe, and it would be a strange doctrine which would refuse them access to their own courts to protect them and the tribe against the results of fraud and deceit practiced upon them in regard to such property, regardless of any specific legislation granting such jurisdiction. United States v. San Jacinto Tin Co., 125 U. S. 285, 8 Sup. Ct. 850, 31 L. Ed. 747; United States v. Bell Telephone Co:, 128 U. S. 315, 9 Sup. Ct. 90, 32 L. Ed. 450; United States v. Lock Shaw (C. C.) 39 Fed. 433, 3 L. R. A. 232.

But this litigation is instituted under the provisions of a specific act of Congress. By section 18 of the act of Congress of April 26, 1906 (chapter 1876, 34 Stat. 144), entitled "An act to provide for the final disposition of the affairs of the Five Civilized Tribes in the Indian Territory, and for other purposes," it was provided:

"That the Secretary of the Interior is hereby authorized to bring suit in the name of the United States, for the use of the Choctaw, Chickasaw, Cherokee, Creek or Seminole Tribe, respectively, either before or after the dissolution of the tribal government, for the collection of any moneys or recovery of any lands claimed by any of said tribes whether such claim shall arise prior to or after the dissolution of the tribal government, and the United States Courts in the Indian Territory are hereby given jurisdiction to try and determine all such suits and the Secretary of the Interior is authorized to pay from the funds of the tribe interested, the costs and necessary expenses incurred in maintaining and prosecuting such suits."

The bills allege that the Secretary of the Interior has caused these suits to be instituted and prosecuted in the name of the United States for the use of the Creek Nation. The suit is for the cancellation of deeds and patents alleged to be void by reason of matters set up in the bills, and prays that the court decree the title to the land involved to be in the nation. It is therefore, in my opinion, such a suit for the recovery of land as is contemplated in the act. The attorney for the nation is one of the subscribing counsel, from which it may be assumed the nation is asserting its claim. The name of the United States is used as a complainant by authority of the act. The suit therefore is one of those contemplated by the act, and the jurisdiction of this court must be measured by the act. The United States do not appear as a suitor further than the act itself provides for the use of their name, so that no interest they may have in protecting the government in carrying out its agreement with the tribe

can be considered, although counsel in drawing the bill and in argument have apparently sought to base the jurisdiction both upon the special act and upon the interest which the United States themselves have in the matter.

A suit by the United States against the defendants for fraud practiced upon the government is one thing; a suit in the name of the United States for the use of the Creek Nation, authorized by special act of Congress, is another—and these cases are of the latter class. But on the faces of the bill the suits are still within the jurisdictions of this court, because the United States appear as plaintiffs or petitioners, unless the contention of defendants that they are merely a nominal party is sound. It is urged that Congress merely happened to provide that the suit should be brought in the name of the United States, and might as readily have provided that it be in the name of the Secretary, or the principal chief, or any individual; but to my mind the fact that it did not do so is significant. It provided for suits in which the United States should be plaintiffs, and of which, on the face of the papers, this court would have jurisdiction. If it was competent for Congress to provide for the bringing of these suits at all, was it not competent for it to provide that they should be brought in such manner as to give the tribe the status of the United States, with relation to suits in the federal courts, and is it not fair to assume that Congress so intended? United States v. Churchyard (C. C.) 132 Fed. 82. The act of the Secretary in instituting the suit is the act of the United States whom he represents, and the United States Congress legislates for the tribe by virtue of the relation they bear to the tribe in the nature of a guardianship. It is upon this theory that Congress assumed to legislate regarding the matter, and it is a very reasonable conclusion that Congress intended that such suits should be tried in federal courts, and purposely provided that they should be brought in the name of the United States.

It is argued that the courts of the Indian Territory had all the jurisdiction of the federal Circuit and District Courts, and that, if it was necessary to specially confer upon the Indian Territory courts jurisdiction of such suits as these by section 18 above quoted, it must follow that such jurisdiction did not and does not now exist in this court as a federal Circuit Court. It is true that it must be presumed that Congress does not pass useless laws, and that it must ordinarily be assumed that no act is passed without reason therefor. The jurisdiction finally exercised by the United States courts in Indian Territory prior to statehood was established by a series of acts, each referring back to a former act or acts, and each succeeding act, as a rule, adding to the jurisdiction.

A careful examination of all these jurisdictional provisions inclines me to the opinion that without this special legislation the courts of Indian Territory would have had jurisdiction of these causes; the United States being a party plaintiff or petitioner. But I am not prepared to say that the matter is entirely free from doubt, and, as their jurisdiction was purely statutory, it is not unreasonable to assume that Congress thought best to remove all doubts by ex-

plicitly conferring jurisdiction. But, however that may be, it does not follow that the giving of such jurisdiction to the Indian Territory courts excludes the jurisdiction of this court.

It is significant that at the very time this act of April, 1906, was passed, Congress had under consideration the statehood bill, which was passed soon afterwards, and by the terms of which the Indian Territory courts would pass out and this court come into existence. Nothing in the act indicates that it was intended that all these suits should be instituted before statehood, and Congress must have had in mind that such suits instituted after statehood would be instituted in the United States Circuit Court, under the general provision of law giving jurisdiction in cases where the United States are parties plaintiff or petitioner. There is nothing in the section referred to which in my opinion confers exclusive jurisdiction upon the Indian Territory courts, and which makes the right to institute such suits coexistent only with such courts. It provides that such suits may be filed either before or after the dissolution of the tribes, and, until further legislation to the contrary, such suits may be filed when the claims referred to in the act shall arise. The first purpose effected by the act is to give the Secretary of the Interior authority to bring such suits. Without such specific authority the Secretary had no power, independent of the Department of Justice, to bring suit in the name of the United States.

By section 771 of the Revised Statutes (U. S. Comp. St. 1901, p. 601), it is provided:

"It shall be the duty of every district attorney to prosecute, in his district, all delinquents for crimes and offenses cognizable under the authority of the United States, and all civil actions in which the United States are concerned, and, unless otherwise instructed by the Secretary of the Treasury, to appear in behalf of the defendants in all suits or proceedings pending in his district against collectors, or other officers of the revenue, for any act done by them or for the recovery of any money exacted by or paid to such officers, and by them paid into the Treasury."

In United States v. San Jacinto Tin Co., 125 U. S. 273, 8 Sup. Ct. 850, 31 L. Ed. 747, a suit instituted directly by the Attorney General without intervention of the district attorney, to set aside a patent to certain lands, the authority of the Attorney General to institute such suit was questioned, and the court said:

"Notwithstanding the want of any specific authority to bring an action in the name of the United States to set aside and declare void an instrument issued under its apparent authority, we cannot believe that, where a case exists in which this ought to be done, it is not within the authority of that officer to cause such action to be instituted and prosecuted. He is undoubtedly the officer who has charge of the institution and conduct of the pleas of the United States, and all the litigation which is necessary to establish the rights of the government."

In United States v. Throckmorton, 98 U. S. 61, 25 L. Ed. 93, it is said:

"We are of the opinion that, unless, by virtue of an act of Congress, no one but the Attorney General, or some one authorized to use his name, can bring a suit to set aside a patent issued by the United States, or a judgment rendered in its courts upon which such patent is founded."

But here we have specific legislation authorizing the bringing of the suit by the Secretary of the Interior, and the power of Congress to grant such authority cannot be questioned.

But it is contended that, even though the Secretary may institute the suit, the Attorney General or the district attorney must appear as counsel, and that he cannot be represented by attorneys not connected with the Department of Justice acting as special counsel.

It is clear, as we have seen, that ordinarily, in the absence of special provisions to the contrary, in any particular case, the Attorney General and the district attorneys are the officers upon whom the law imposes the duty of instituting and conducting the litigation which is necessary to establish the rights of the government; that is, to bring suit for such purposes, in the name of the United States. But by the act of April 26, 1906, the Secretary of the Interior is specially authorized to bring suit in the name of the United States, for the purposes mentioned in the act. It is further provided that any costs and necessary expenses incurred therein may be paid from the funds of the tribe interested. The bill alleges that the Secretary of the Interior has caused this suit to be instituted and prosecuted in the name of the United States of America, for the use of the Creek Nation, on the grounds and for the causes therein alleged, and has duly authorized and empowered the subscribing counsel to act as such in instituting and prosecuting the same. In view of the special authority vested in the Secretary to institute such suits, and the provision by which he may defray the necessary costs and expenses of the same, may the Secretary, if he so desire, employ for the purpose special counsel not in any way connected with the Department of Justice?

Kennedy v. Gibson et al., 75 U. S. 498, 19 L. Ed. 476, was a suit by a receiver of a National Bank against its stockholders to enforce a statutory liability. The law provided:

"That all suits and proceedings arising out of the provisions of this act, in which the United States or its officers or agents shall be parties, shall be conducted by the district attorneys of the several districts, under the direction and supervision of the solicitor of the treasury."

The suit was prosecuted by special counsel and not by the district attorney. One of the grounds of demurrer alleged by the defendants was that the bill was not signed by the United States attorney. In relation to this the court say:

"The receiver is the agent of the United States, and, according to the fifty-sixth section of the act, this suit should have been conducted by their attorney; but this provision is merely directory. The question which arises is between the United States and its officers. The rights of the defendants are in no wise concerned, and they cannot be heard to make the objection that this duty of the local law officer of the government has been devolved upon another. It is to be presumed there were sufficient reasons to warrant this departure from the letter of the law."

United States Fidelity Co. v. Kenyon, 204 U. S. 349, 27 Sup. Ct. 381, 51 L. Ed. 516, was a case involving an act of Congress approved August 13, 1894 (Act Aug. 13, 1894, c. 282, 28 Stat. 279 [U. S. Comp. St. 1901, p. 2315]), providing that contractors on public buildings should enter into bonds with the United States that, among other

things, they would promptly make payments to all persons supplying them labor and materials, and providing that such persons not so paid might be furnished with a certified copy of the contract and bond upon which they should have a right of action, and authorizing them to bring suit in the name of the United States for their use and benefit, against the contractor and his sureties. It was further provided that the court might require proper guaranty for costs in case judgment should be for the defendant. Kenyon, a materialman, not being promptly paid, brought suit on the bond. The suit was by the United States, "suing herein for the benefit and on behalf of James S. Kenyon." It was prosecuted by private counsel of Kenyon, and not by the Attorney General or district attorney. While it was held that the United States was a "real and not a mere nominal plaintiff" in the action, and that therefore the Circuit Court had jurisdiction, the right to maintain the action by special and private counsel is not questioned.

If a suit should be hereafter instituted by the Attorney General or the district attorney against these defendants, seeking the same relief, it would of necessity be in the name of the United States, and, being the same plaintiff against the same defendants, involving the same subject-matter, and seeking the same relief, would be barred by this suit. It appears therefore, as said in Kennedy v. Gibson, supra, that, at most, the question is between the United States and its officers, that the rights of the defendants are in no wise concerned, and that they cannot be heard to make the objection that the duty of a local law officer of the government has been devolved upon another.

It is charged that the bills are multifarious. In Brown v. Guarantee Co., 128 U. S. 403, 9 Sup. Ct. 127, 32 L. Ed. 468, it is said:

"It is well remarked by Lord Cottenham, in Campbell v. Mackay, 7 Sim. 564, and in 1 Myl. & Cr. 603, 'to lay down any rule applicable universally, or to say what constitutes multifariousness, as an abstract proposition, is, upon the authorities, utterly impossible.' Every case must be governed by its own circumstances; and, as these are as diversified as the names of the parties, the court must exercise a sound discretion on the subject. Whilst parties should not be subjected to expense and inconvenience, in litigating matters in which they have no interest, multiplicity of suits should be avoided, by uniting in one bill all who have an interest in the principal matter in controversy, though the interests may have arisen under distinct contracts. In that case the bill was filed against the two executors of the will of Daniel Clark, the heirs at law of his legatee, and the several purchasers of various pieces of property which had been sold off from the estate. The relief asked was an accounting in respect to the rents and profits of the several parcels and for general relief, as the heir and devisee of Clark under a different testament. Under this state of facts, the court said (page 643): 'The right of the complainant, Myra, must be sustained under the will of 1813, or as heir at law of Daniel Clark. The defendants claim mediately or immediately under the will of 1811, although their purchases were made at different times and for distinct parcels of the property. They have a common source of title, but no common interest in their purchases. And the question arises, on this state of facts, whether there is misjoinder or multifariousness in the bill, which makes the defendants parties. * * * And the main ground of the defense, the validity of the will of 1811, and the proceedings under it, is common to all the defendants. Their interests may be of greater or less extent; but that constitutes a difference in degree only and not in principle. There can be no doubt but that a bill might have been filed against each of the defendants; but the question is whether they may not

all be included in the same bill. The facts of the purchase, including notice, may be peculiar to each defendant; but these may be ascertained without inconvenience or expense to codefendants. In every fact which goes to impair or establish the authority of the executors, all the defendants are alike interested. In its present form the bill avoids multiplicity of suits, without subjecting the defendants to inconvenience or unreasonable expense.'

"The case against one defendant may be so entire as to be incapable of being prosecuted in several suits, and yet some other defendant may be a necessary party to some portion only of the case stated. In the latter case the objection of multifariousness cannot be allowed to prevail. Attorney General v. Poole, 4 Myl. & Cr. 17, 31; Turner v. Robinson, 1 Sim. & St. 313; Attorney General v. Cradock, 3 Myl. & Cr. 85.

"It is not indispensable that all the parties should have an interest in all the matters contained in the suit. It will be sufficient if each party has an interest in some material matters in the suit, and they are connected with the others. Addison v. Walker, 4 Yo. & Col. Ch. 142; Parr v. Attorney General, 8 Cl. & Fin. 409, 435; Worthy v. Johnson, 8 Ga. 236.

"To support the objection of multifariousness, because the bill contains different causes of suit against the same person, two things must concur: First, the grounds of the suit must be different; second, each ground must be sufficient as stated to sustain a bill. Bedsole v. Monroe, 5 Iredell, Eq. 313; Larkins v. Biddle, 21 Ala. 252; Nail v. Mobley, 9 Ga. 278; Robinson v. Cross, 22 Conn. 171."

In Walker v. Powers, 104 U. S. 245, 26 L. Ed. 729, the court, quoting from Mr. Story, say:

"By 'multifariousness' is meant the improperly joining in one bill distinct and independent matters, and thereby confounding them, as for example, the uniting in one bill of several matters, perfectly distinct and unconnected, against one defendant, or the demand of several matters, of a distinct and independent nature, against several defendants in the same bill."

On the other hand, as to when a bill is not multifarious, it is said, in Curran v. Campion, 85 Fed. 67, 29 C. C. A. 26:

"No bill is multifarious which presents a common point of litigation, the decision of which will affect the whole subject-matter, and will settle the rights of all the parties to the suit, and that it is not indispensable that all the parties should have an interest in all the matters contained in the suit; but it is sufficient if each party has an interest in some material matters involved in the suit, and they are connected with the others."

In Westinghouse Air Brake Co. v. Kansas City Southern Ry. Co., 137 Fed. 26, 71 C. C. A. 1, it is said:

"The vice of multifariousness is the union of causes of action which, or of parties whose claims, it is either impracticable or inconvenient to hear and adjudicate in a single suit. Where this vice does not exist, where it is as practical and convenient for the court and the parties to deal with the claims or causes of action presented, and the parties joined by a petition, in one suit as in many, the pleading is not multifarious, and it should be sustained."

In each case the question of multifariousness is one within the sound discretion of the court, and the exercise of that discretion is seldom, if ever, reviewed on appeal. Ulman v. Iaeger (C. C.) 67 Fed. 985. But it is nevertheless incumbent on the court to exercise such discretion with care; that is, applying to the question a sound discretion. In each of these cases the controversy involves what was originally a single tract of land. The bills charge that a portion of the defendants, either individually or combining together, secured the tract by fraud.

It is charged that the other defendants, with knowledge of the frauds, secured the several lots in which they are separately interested, either mediately or immediately, from the defendants who had procured it in the first instance. Each lot is a part of the original tract. The main question in the case is whether in the first instance the patents or deeds were procured in the fraudulent manner charged in the bill. In this question all the defendants are interested, and if, as is alleged in this bill, they all secured their several interests with knowledge of the manner in which the lots were secured in the first instance, then they are interested in the main question in the case, and the bill presents a common point in litigation, the decision of which may affect the whole matter, settling the rights of all parties. If, on final hearing, the complainant should establish the allegations of fraud on the part of the principal defendants, there will be the further question of participation therein by the other defendants, or as to their having purchased with knowledge of the original fraud. This will involve a separate and distinct inquiry on that point, as to each subsequent purchaser named as defendant; but the question as to each may be as readily and finally established in this present case as it could be in a separate action, as to each defendant, and with much less court costs and vastly more convenience to the court. Whenever a defendant is shown to have purchased with knowledge of the facts involved in the original transaction, there is no reason why he should not be joined in this action, and, wherever a defendant is shown to have been an innocent purchaser in good faith for a valuable consideration, that in all probability will be a complete defense as to him, and that may be shown just as well in this action as in a separate action against him individually. In my opinion, in view of the foregoing authorities, the bill is not multifarious.

As to the question of laches interposed by some of the demurrers, it is alleged in the bills, and for the purpose of these demurrers must be taken as true, that neither the United States nor the Creek Nation had any knowledge of the matters and things charged until immediately before the filing of the suits. This allegation meets the objection of laches, so far as the consideration of these demurrers is concerned.

In view of the foregoing considerations, the demurrers will be overruled.

It is so ordered.