UNITED STATES v. ALLEN et al.

(Circuit Court, E. D. Oklahoma. August 6, 1909.)

No. 284.

**1. Courts (§ 302\*)—Jurisdiction of Federal Courts—Suits to Which United States is Party.**

By virtue of Const. art. 3, § 2, and the federal judiciary acts (Act March 3, 1875, c. 137, § 1, 18 Stat. 470, as amended by Act March 3, 1887, c. 373, § 1, 24 Stat. 552, as corrected by Act Aug. 13, 1888, c. 866, § 1, 25 Stat. 433 [U. S. Comp. St. 1901, p. 508]), a Circuit Court of the United States has jurisdiction of any suit in which the United States properly appears as plaintiff.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 843; Dec. Dig. § 302.\*]

**2. Indians (§ 13\*)—United States—Capacity to Sue—Suit in Relation to Indian Lands.**

The several acts of Congress and treaties by which the United States made unconditional grants of lands in fee simple to each of the Five Civilized tribes of Indians in Indian Territory in their tribal capacity, subject to defeasance only in case the tribe should cease to exist or to occupy the lands, followed by the allotment of such lands in severalty to members of such tribes with the consent of the national government, left no vestige of title to lands so allotted in the United States which will support an action by it in its own behalf in respect to such lands.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 13.\*]

**3. Indians (§ 13\*)—Status of Members of Five Civilized Tribes—Suits Respecting Lands—Parties.**

By act March 3, 1901, c. 868, 31 Stat. 1447, amending section 6 of the general allotment act of February 8, 1887 (24 Stat. 390, c. 119), and providing, inter alia, that "every Indian in the Indian Territory is hereby declared to be a citizen of the United States and is entitled to all the rights, privileges and immunities of such citizens," all members of either of the Five Civilized Tribes in such territory became and remain citizens, unaffected by the fact that by subsequent legislation their tribal existence was continued to await the final disposition of the tribal property, or that restrictions still exist on their power to alienate their lands after allotment in severalty; and such being their political and civil status, with full power to maintain suits to protect their rights, the United States occupies no such relationship of trust or guardianship toward them as entitles it to maintain in their behalf suits in its own name, to which they are not parties, to cancel conveyances made by them of their allotted lands.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 30; Dec. Dig. § 13.\*]

**4. Equity (§ 148\*)—Bill—"Multifariousness."**

A bill filed by the United States to cancel for fraud a large number of separate conveyances made by individual Indians to the several defendants, and having no connection with each other, the suit being on behalf of the various grantors, is multifarious (citing Words and Phrases, vol. 5, p. 4616).

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 341–367; Dec. Dig. § 148.\*]

In Equity. On demurrer to bills.

Charles W. Russell, Asst. Atty. Gen., A. N. Frost, Sp. Asst. Atty. Gen., and William J. Gregg, U. S. Dist. Atty.

Robert L. Owen, Gibson, Ramsey & Thomas, Zevely, Givens &

Smith, Parker & Rider, W. H. Kornegay, James E. Humphrey, B. B. Blakeney, Crump, Rogers & Harris, Rodgers & Clapp, Bond & Melton, Kane & Burford, Charles M. Fechheimer, Hutchings, Murphey & German, Brewers & Andrews, Kenneth S. Murchison, Brown & Stewart, Allen & Pinson, Fuller & Porter, W. W. Hastings, Preston S. Davis, Gilbert & Bond, J. F. McKeel, R. H. Matthews, E. E. McInnis, J. H. Keith, James S. Davenport, Roach & Bradley, Thomas A. Sanson, Stuart & Gordon, Cottingham & Bledsoe, Owen & Stone, Hocker & Bleakmore, Irvin Donovan, Utterback & Hayes, J. G. Ralls, Willmott & Wilhoit, S. V. O'Hare, F. H. Kellogg, D. L. Sleeper, Benj. Martin, Jr., Potterf & Walker, West, Mellette & Jones, Jesse W. Watts, Wrightsman, Diggs & Bush, W. M. Matthews, Cravens, Crosby & Crosby, Paul F. Mackey, S. B. Dawes, Bynum & Allen, C. C. Julian, A. L. Beaty, J. B. Tomlinson, J. M. Humphreys, Walter E. Elrod, Frank L. Warren, Geo. B. Denison, Wm. P. Thompson, Bailey & Kistler, Maxey & Runyan, Robt. F. Blair, W. W. Wood, R. A. Smith, and Enloe V. Vernor, for defendants.

CAMPBELL, District Judge. The United States, as complainants, have filed in this court numerous bills, in each of which many individuals are made defendants. Each bill has relation to lands of one of the Five Civilized Tribes. In the first paragraph of each bill it is alleged that, pursuant to the terms of certain treaties entered into between the United States and the tribe referred to, the United States granted by patent to each tribe certain lands in the Indian Territory, now the Eastern district of Oklahoma, and that by the terms of said treaties and the laws of the United States the United States solemnly obligated themselves to secure and protect such tribe of Indians and the members thereof in the possession, use, and enjoyment of and the title to said land, and that according to the terms of said treaties, and of said acts of Congress relating thereto, and of the patent to said lands, the said tribe of Indians and every member thereof have at all times been and now are without power to dispose of any part of said lands, or of any interest therein, without the consent and authority of the United States, or otherwise than in the manner prescribed by the United States.

It is alleged that by reason of the helpless and dependent character of such Indian tribe and the several members thereof the United States as the guardian have exclusive dominion over and control of the property of said tribe and the several members thereof, by virtue of which there is imposed upon the United States the duty to do whatever is necessary for the guidance, welfare, and protection of such Indians; that said tribe has always been and is now recognized, treated, and dealt with as a tribe of Indians by the United States, under the care of an Indian agent; that Congress still appropriates large sums of money for the benefit and protection of said tribe and the individual members thereof, and for school purposes; that the United States still have in their possession a large sum of money belonging to said tribe; and that there still remains unallotted a large body of land, the common property of such tribe.

Reference is then made to the acts of Congress under which the

lands of such tribe have been allotted to the individual members thereof, subject to the various restrictions against the alienation thereby imposed. Paragraph 4 of the bill then sets forth the character of the land involved at the date of the conveyance sought to be canceled, as to whether allotted or tribal. For convenience, the bills may be classed as follows:

Cherokee Nation: (1) All cases of conveyance by allottees to defendants where restrictions will be removed July 27, 1908. (2) All cases of land not allotted at the time of conveyance complained of, but sold by a person claiming a right to be enrolled, and later denied citizenship. (3) Sales, without approval of Secretary, of lands inherited by full blood heirs, before April 26, 1906. (4) Same as above, after April 26, 1906. (5) Homesteads of freedmen. (6) Conveyance by other than allottee covering land allotted at date of conveyance. (7) Conveyances by other than allottee covering lands which were tribal at date of conveyance. (8) Homesteads of intermarried whites. (9) Mixed bloods, homesteads of half bloods and more, and surplus of three-fourths blood and more. (10) Full bloods, prior to April 26, 1906. (11) Full bloods, after April 26, 1906.

In the Creek Nation the bills may be classified the same as above, except that there is no bill No. 8.

In the Choctaw and Chickasaw Nations the bills may be classed as above. In addition, there is, as to these nations, a bill covering Choctaw and Chickasaw lands sold prior to the removal of restrictions under Act May 27, 1908, c. 199, 35 Stat. 314.

As to the Seminole Nation, the bills may be classified as follows: Conveyances by freedmen after allotment and before issuance of patent; conveyances by full blood heirs before issuance of patent; conveyances by mixed bloods before issuance of patent; conveyance by other than allottees; conveyances by adopted citizens before issuance of patent; conveyances by full bloods.

It is to be noted that all the bills involve lands which had been allotted at the time of the conveyance complained of, except Nos. 2 and 7. None of the bills applying to the Seminole Nation involve unallotted lands. In class No. 2 it is alleged that the tracts of land involved comprise lands of the tribe which had never been allotted at the time of the execution and delivery and recording of the conveyances sought to be canceled, but were then tribal lands, and that no individual at that time nor ever has had any separate ownership thereof or right to transfer or incumber the same. In class No. 7 it is alleged that at the date of the conveyance sought to be canceled the lands were tribal lands, but it is not alleged that they are still tribal and unallotted. Paragraph 5 of the bill then proceeds substantially as follows:

"Your orator further shows that each of the deeds, mortgages, leases, contracts of sale, powers of attorney, and other evidence of title or incumbrance upon tracts of land as hereinafter set forth, was secured by defendants in defiant, willful, and open violation of law, and the duty which rested upon this nation and every member thereof, and for the purpose of unlawfully incumbering said lands allotted to members of the said Seminole tribe of Indians, all of whom, under the treaties and laws of the United States, were without power or authority to sell, alienate, or incumber said lands in any manner whatsoever. And your orator further shows that, by filing for record and

causing to be recorded the said deeds and other instruments of writing, each of the defendants herein named has unlawfully obtained for himself an apparent title or interest of record to the land hereinbefore described, all of which was done in defiance of said agency supervision and in open violation and contempt of the laws of the United States, to the great detriment, irreparable injury, and loss of said Indians, and in direct interference with the supervision, control, policy, and duty of the government of the United States in that behalf, and in obstruction of the execution of the laws."

Paragraph 6 then sets forth in detail the various conveyances sought to be canceled, involving numerous separate and distinct tracts of land, in each of which conveyances, in most instances, the individual allottee or those claiming through him appear as grantors, and one or more of the defendants appear as grantees.

Paragraph 7 alleges upon information and belief that the defendants have secured, or are proceeding to secure, other unlawful conveyances not now recorded, a minute description of which the pleader alleges cannot be given without the discovery prayed for, and that the defendants are continuing to induce the members of the tribe to execute and deliver to them such conveyances, etc., and in many instances are taking possession of the lands covered by such conveyances for wholly improper purposes, and in fraud of the said tribe. The bill then proceeds:

"And your orator further shows and avers that the defendants will so continue their unlawful acts and doings, and that their conduct as specifically alleged in paragraphs 5 and 6 hereof, as all their present and future conduct, as in this paragraph alleged, will, if continued, greatly harass your orator in the discharge of its duty to and in the administration of its policy in relation to said Indians, and compel it to bring many suits in order to annul and set aside the said deeds, conveyances, mortgages, powers of attorney, leases, and contracts for and about the said lands, which the defendants have taken, are taking, and will continue to take, as herein alleged."

The bill then proceeds specifically as follows:

"(8) And your orator further shows that, in addition to the instruments of writing hereinbefore mentioned and specified, upward of 4,000 other instruments of writing, of a nature similar to those hereinbefore set forth, purporting to convey or to incumber or to affect the title of lands located within the Eastern judicial district of Oklahoma, and only allotted to members of the Five Civilized Tribes, or belonging to said tribes, have been executed and placed on record by the defendants herein and other persons and corporations, in contravention to the treaties entered into between your orator and the said several Indian tribes and the laws of the United States; and your orator shows that unless it shall be permitted to join in its bills numerous defendants, against each of whom your orator has a like cause of action, and against each of whom your orator seeks the same relief, and whose pretended claims are based upon similar facts and involve precisely the same questions of law, your orator will be driven to the necessity of bringing a great number of separate and distinct suits, and that it will be practically impossible for your orator to prosecute and for the court to adjudicate and dispose of so large a number of separate and distinct suits within any reasonable length of time.

"(9) Your orator further shows that, under and by virtue of the aforesaid treaties and acts of Congress, all of the deeds and other instruments of writing hereinafter mentioned constitute a damage to the titles of the said members of the said tribes, thereby greatly deteriorating the value of the interests of the said tribes and members of said tribes in their lands, and that defendants are interfering with the possession and rights of the said tribes and members of the said tribes in their said lands, and are seriously retarding the control and supervision of the government over them, and are producing ir-

reparable injury to your orator and the said tribes and members of said tribes. And your orator further shows that by reason of the duties, obligations, and rights of the government, as set forth in this bill, the government is charged with the duty of protecting in the courts the rights of the said tribes and members thereof, and in that behalf is charged with a trust of a high and delicate character, and that in the performance of these obligations and trust duties it is necessary to seek the aid of this court, to the end that the defendants herein named should not only be ousted from the possession of the said lands, but that the court should order the said several deeds and instruments of writing herein specified and described to be surrendered and delivered up for cancellation, and the record purged of the same; that the court should order the defendants to discover all facts relating to their possession of said lands, and to set forth all deeds, conveyances, mortgages, powers of attorney, and contracts in their possession, other than those particularly mentioned and described in this bill, in order that the same may be canceled.

"(10) Your orator further shows that it has joined in this bill of complaint numerous defendants for the purpose of avoiding a multiplicity of suits to recover the possession of the said lands for the benefit of the said tribes and members thereof, and for the purpose of avoiding a multiplicity of suits to enjoin each of the several defendants herein from continuing to occupy the said lands and from taking any further deeds or other instruments of writing purporting to convey the title to said lands, and a multiplicity of suits to have the deeds and instruments of writing which they have induced the said members to make ordered surrendered and delivered up for cancellation and the record purged thereof; that the interest of your orator, as guardian and trustee for the Indians and as parens patriæ, is identical in all cases, and that the right of your orator for relief against the said several defendants is identically the same as against each, and the remedy against the said defendants hereinafter prayed for is precisely the same as against each.

"Forasmuch, therefore, as your orator is remediless in the premises at and by the strict rule of the common law, and is only relievable in a court of equity, where matters of this kind are properly cognizable and relievable, and to the end that your orator may have that relief which it can only obtain in a court of equity, and that each of the defendants herein named may answer the premises, the benefit whereof is expressly waived by your order, your orator prays. * * *"

The prayer of each bill is, first, that the conveyances set forth in paragraph 6 shall be decreed to be void and of no effect as instruments of conveyance, and shall be canceled, and that the title to the lands therein described be held and decreed to be in the allottees or their heirs, subject to the terms, conditions, and limitations contained in the treaties, agreements, and laws of the United States. It is further prayed that the defendants shall be required to make discovery and disclosure of all other possessions, claim to possessions, deeds, conveyances, mortgages, powers of attorneys, contracts, and other instruments of writing, setting forth a list or schedule thereof in their possession, conveying the lands allotted to any of the members of said tribe, or unallotted lands of the said tribe, and that the defendant be required to surrender and deliver up to the court all such deeds, etc., and that the same be canceled, and such lands decreed to be in the tribe or members thereof to whom they have been allotted, and that all defendants in possession or claiming possession thereof be ordered to vacate or cease making such claims; and then follows the usual prayer for subpœna.

Many of the defendants filed demurrers to these bills, and a date was set by the court for hearing arguments thereon, and all such de-

murrers were presented at the same time, fully argued by counsel, and thereupon submitted to the court. The demurrers set up many grounds, the main ones of which are in substance as follows: That the court is without jurisdiction; that the bill of complaint fails to show any such interest in the plaintiff as to entitle it to mantain these suits; because the plaintiff has no capacity to maintain these suits; because the bill of complaint is wholly devoid of equity; because by said bill it is sought to quiet titles to land of which the plaintiff is not now and has never been in possession; because there is a defect of parties to these suits; because there is a misjoinder of alleged causes of action, in this, that the alleged cause of action against each defendant is improperly joined with that of numerous other defendants, when there is no joint interest as between the defendants, or any joint occupation of the property or any reason that would authorize the joint suit alleged; because the bills are multifarious; because the bills do not disclose such a state of facts as entitle plaintiff to recover in any event.

While a few of the bills filed relate to transactions alleged to have taken place prior to allotment of the lands involved, it appears that such lands have since been allotted, and we have now to consider only lands of the Five Civilized Tribes allotted to citizens thereof.

The contention that the court has no jurisdiction is unsound, if the United States are properly parties plaintiff, because, wherever the United States appear as parties plaintiff or petitioners, the Circuit Court of the United States has jurisdiction. Const. art. 3, § 2, cl. 1; Act Cong. March 3, 1875, c. 137, § 1, 18 Stat. 470, as amended by Act March 3, 1887, c. 373, § 1, 24 Stat. 552, as corrected by Act Aug. 13, 1888, c. 866, § 1, 25 Stat. 433 (U. S. Comp. St. 1901, p. 508).

The question of the capacity of the United States to sue involves the question as to whether they have such an interest in the controversy as will entitle them to maintain the suits; for unless they have such interest, either by way of title in the land, or duty or obligation in relation to the allottees and the lands involved, the demurrers on this point must be sustained. In United States v. San Jacinto Tin Co., 125 U. S. 273, 8 Sup. Ct. 850, 31 L. Ed. 747, a suit to annul and set aside a patent, the court say:

"But we are of opinion that, since the right of the government of the United States to institute such a suit depends upon the same general principles which would authorize a private citizen to apply to a court of justice for relief against an instrument obtained from him by fraud or deceit, or any of those other practices which are admitted to justify a court in granting relief, the government must show that, like the private individual, it has such an interest in the relief sought as entitles it to move in the matter. If it be a question of property, a case must be made in which the court can afford a remedy in regard to that property; if it be a question of fraud which would render the instrument void, the fraud must operate to the prejudice of the United States; and if it is apparent that the suit is brought for the benefit of some third party, and that the United States has no pecuniary interest in the remedy sought, and is under no obligation to the party who will be benefited to sustain an action for his use—in short, if there does not appear any obligation on the part of the United States to the public, or to any individual, or any interest of its own—it can no more sustain such an action than any private person could under similar circumstances."

Has the government any interest by way of ownership of or title to these allotted lands? They were originally granted by patent to the respective tribes, to be owned and held by them while their tribal relations should exist, or until they should abandon the same. The treaty with the Choctaws provided that the land should be granted to them "in fee simple to them and their descendants, to inure to them while they should exist as a nation and live on it." Kappler, p. 311; 7 Stat. 333. This same title was vested in the Chickasaws. Kappler, p. 487; 11 Stat. 573. By treaty with the Cherokees, of December 29, 1836 (7 Stat. 478), it was agreed that the lands ceded them should be conveyed to them by patent, according to the provisions of the act of May 28, 1830, above referred to, and patent was issued accordingly. By treaty with the Creeks it was provided that the lands assigned them should be granted by patent in fee simple, and that the right thereby granted should be continued to said tribe so long as they should exist as a nation and continue to occupy the same. 7 Stat. 417. By treaty of 1866 (14 Stat. 755), the United States granted and sold to the Seminole Nation the major part, if not all, of the lands now alloted to them for the sum of 50 cents per acre, a total sum of $100,000. This appears to have been an unconditional grant. The above land so granted to the several tribes was occupied by them in their tribal capacity until the allotment of these lands in severalty to the individual members, with the consent of the government, so that the tribal extinction or abandonment contemplated in the treaties is no longer to be considered. Since the utmost interest by way of title which it can possibly be contended remained in the government was the possibility of its reverting upon such tribal extinction or abandonment, it follows that no vestige of title to these lands now remains in the United States. These lands are now allotted lands, for which allotment certificates have issued, followed, in many instances, by patent, so that the equitable title, at least, has passed to the individual allottee. Wallace v. Adams, 143 Fed. 716, 74 C. C. A. 510.

Under the general allotment act, where the title passes direct from the government to the allottee, the issuance of patent passes title to the allottee in fee simple, and under no circumstances does it revert to the United States. Schrimpscher v. Stockton, 183 U. S. 290, 22 Sup. Ct. 107, 46 L. Ed. 203. There is less reason why it should revert here. It follows that the complainant can claim no such interest by way of title to these lands as would entitle it to maintain these suits.

In the act of Congress approved May 27, 1908 (35 Stat. 314, c. 199), relative to the removal of restrictions, is found the following provision:

"Nothing in this act shall be construed as a denial of the right of the United States to take such steps as may be necessary, including the bringing of any suit and the prosecution and appeal thereof, to acquire or retain possession of restricted Indian lands, or to remove cloud therefrom, or clear title to the same in cases where deeds, leases or contracts of any other kind or character whatsoever have been or shall be made contrary to law with respect to such lands prior to the removal therefrom of restrictions upon the alienation thereof; such suits to be brought on the recommendation of the Secretary of the Interior, without costs or charges to the allottees, the necessary

171 F.—58

expenses incurred in so doing to be defrayed from the money appropriated by this act."

It is contended that this provision confers upon complainant authority to institute and maintain these suits in the name of the United States. The dominant purpose of this provision seems to be to preclude any such construction of the act as would deny the United States the right to bring such suits referred to, rather than to confer such right. The bill, as originally introduced, did not contain this provision. On February 10, 1908, at the same session, a bill was introduced by Mr. Sherman, in the House, and Senator Clapp, in the Senate, specifically conferring upon the Attorney General the right to bring such suits in the name of the United States, "for the use and benefit and on behalf of the Choctaw, Chickasaw, Cherokee, Creek or Seminole Tribes, or any enrolled member of either thereof." This bill covers over six pages, providing in detail for the conduct of such suits, and also providing for the transfer from the state to the federal courts of such suits in which the United States may become a party, as provided in the bill. This bill did not become a law. After its introduction, and while the committee on Indian affairs was considering the act of May 27, 1908 (35 Stat. 312, c. 199), the Assistant Attorney General for the Interior Department appeared before the committee (Report of Committee on Indian Affairs for March 20, 1908), stating that the department was in favor of the bill under consideration, but calling attention to the jurisdictional bill above referred to, saying that:

"The department believes that some provision for jurisdiction should be passed with the other bill, for these reasons, briefly, that, if it is not necessary, it could do no damage."

He then referred to a number of cases arising in the state courts, wherein he deemed it advisable that provision be made for removal to the federal court. He said:

"The department feels that if the restrictions bill should be passed separately that there would be no possible chance, perhaps, to enact this other bill, because the term is approaching its end, and it is very difficult to get legislation when there is any direct, active opposition to it. That being the history of such efforts, it is the feeling of the department that the two should be passed together."

Then followed a lengthy discussion between the representatives of the department and members of the committee relative to incorporating such jurisdictional provisions. It was conceded that without such provision the existence of the authority and jurisdiction was not without question; the Assistant Attorney General insisting, however, that it already existed. Three of the Oklahoma representatives on the committee opposed the incorporation of a measure granting additional jurisdiction, insisting that only such powers and jurisdiction as already existed by virtue of the enabling act and other legislation should be exercised by the federal government, and conceded that, if they existed, their exercise was proper. Finally the paragraph now being considered was incorporated.

The jurisdiction bill which failed was one positively and specifically conferring the authority and jurisdiction as if they had not there-

tofore existed. This provision is negative in its terms, not purporting to confer the right, but disavowing any intention to deny the same. Therefore it can hardly be said that these 11 lines were incorporated in this bill in lieu of the jurisdiction bill containing over six pages. In view of this legislative history, it is my opinion that it was only intended by this paragraph to provide that, if by existing legislation the United States had authority to institute and maintain such suits, it was not the desire nor the intention of Congress for this act to deny it, and it should not be so construed.

It is urged that the appropriation of money for such suits is a legislative recognition of their validity. In my judgment, it cannot be so construed in this case. It is the expressed purpose of Congress not to deny the right if it existed. A refusal to provide money for the conduct of such suits would have prevented their institution and maintenance, resulting the same as a denial of the right. Hence the appropriation. The authority of the complainant to maintain these suits, if it exists, must be found elsewhere. In the recent opinion of this court, overruling the demurrers in the town lot cases (U. S. v. Rea-Read Mill & Elevator Co., 171 Fed. 501) the history of these Indians was thus reviewed:

"In the early part of the last century the Creek, Cherokee, Chickasaw, Choctaw, and Seminole tribes of Indians, known as the Five Civilized Tribes, occupied in their tribal capacity various portions of the states east of the Mississippi river. The growth and development in these then new states had caused the conflict between the advancing civilization of the white man and the habits and customs of these tribes to become more marked. The Indians as a rule were not then sufficiently advanced toward the civilization of their white neighbors to adapt themselves to the new order of things, and to merge these tribes into the body politic of the state was found to be impracticable. It was therefore apparent to Congress that some disposition of these Indians must be made. The plan of giving them, in exchange for their lands east of the Mississippi, portions of the public domain west of the Mississippi, where, as it then appeared, they would be undisturbed by the encroachment of white men for years to come, was finally devised, and on May 28, 1830, an act of Congress was passed (Act May 28, 1830, c. 148, 4 Stat. 411), providing that the President might cause the country west of the Mississippi, not within any state or organized territory and to which the Indian title had been extinguished, to be divided up into districts for the reception of such tribes or nations of Indians who might choose to exchange lands then occupied by them for such districts and remove thereto. This act contained the following provisions:

"'Sec. 3. And be it further enacted, that in the making of any such exchange or exchanges, it shall and may be lawful for the President solemnly to assure the tribe or nation with which the exchange is made, that the United States will forever secure and guaranty to them, and their heirs or successors, the country so exchanged with them; and, if they prefer it, that the United States will cause a patent or grant to be made and executed to them for the same: Provided, always, that such lands shall revert to the United States, if the Indians become extinct, or abandon the same.'"

Referring to the above act of Congress, it was said by Mr. Justice Davis, in The Kansas Indians, 5 Wall. 737, 18 L. Ed. 667:

"The well-defined policy of the government demanded the removal of the Indians from organized states, and it was supposed at the time the country selected for them was so remote as never to be needed for settlement," etc.

The Senate committee, whose report is quoted in Stephens v. Cherokee Nation, 174 U. S. 448, 19 Sup. Ct. 723 (43 L. Ed. 1041), took occasion to say, with reference to the Five Civilized Tribes:

"This section of country was set apart to the Indian with the avowed purpose of maintaining an Indian community beyond and away from the influence of white people. We stipulated that they should have unrestricted self-government and full jurisdiction over persons and property within their respective limits, and that we would protect them against intrusion of white people, and that we would not incorporate them in a political organization without their consent. Every treaty, from 1828 to and including the treaty of 1866, was based on this idea of exclusion of the Indians from the whites, and nonparticipation by the whites in their political and industrial affairs. We made it possible for the Indians of that section of country to maintain their tribal relations, and their Indian polity, laws, and civilization, if they wished so to do. And if now the isolation and exclusiveness sought to be given to them by our solemn treaties is destroyed, and they are overrun by a population of strangers five times in number to their own, it is not the fault of the government of the United States, but comes from their own acts in admitting whites to citizenship under their laws and by inviting white people to come within their jurisdiction, to become traders, farmers, and to follow professional pursuits. It must be assumed, in considering this question, that the Indians themselves have determined to abandon the policy of exclusiveness and to freely admit white people within the Indian Territory; for it cannot be possible that they can intend to demand the removal of the white people either by the government of the United States or their own. They must have realized that, when their policy of maintaining an Indian community isolated from the whites was abandoned for a time, it was abandoned forever."

It is common knowledge of persons conversant with local history that the situation had become such in 1893 that Congress decided that existing conditions should be changed, and that steps should be taken looking to ultimate statehood for Indian Territory and its inhabitants, Indian as well as white. By the appropriation act of that year (Act March 3, 1893, c. 209, 27 Stat. 613–645) a committee consisting of three members was provided for to enter into negotiations with these tribes for the purpose of the relinquishment of the tribal title and the allotment of the lands in severalty to the individual members, having in view the ultimate creation of a state or states of the Union which would embrace these lands. Up to this time the policy of the government had been to exclude white persons from these lands and from commingling with these Indians, but experience had shown this could no longer be done. The Indians themselves, by permitting intermarriage and by various ways, had defeated the governmental policy, and the white noncitizen population in the Indian Territory greatly outnumbered the Indians and was constantly increasing. They were not amenable to the Indian governments. The Indian governments were far from satisfactory to the Indians themselves. Such was the condition that the Senate committee was forced to report:

"It is apparent to all who are conversant with the present condition in the Indian Territory that their system of government cannot be continued. It is not only nonAmerican, but it is radically wrong, and a change is imperatively demanded in the interest of the Indian and whites alike, and such change cannot be much longer delayed. There can be no modification of the system. It cannot be reformed. It must be abandoned, and a better one substituted." Stephens v. Cherokee Nation, 174 U. S. 451, 19 Sup. Ct. 724, 43 L. Ed. 1041.

This was the situation which forced Congress to a radical change of policy and a determination to effect a state government for Indian Territory as soon as it could be accomplished consistent with the rights and interest of the Indians. In the Indian Appropriation Act of June 10, 1896, c. 398, 29 Stat. 321, Congress said:

"It is hereby declared to be the duty of the United States to establish a government in the Indian Territory which will rectify the many inequalities and discriminations now existing in said territory, and afford needful protection to the lives and property of all citizens and residents thereof."

The work of preparing for this change fell upon the commission, first known as the "Dawes Commission," and latterly as the "Commission to the Five Civilized Tribes," acting under successive congressional enactments and agreements with the tribes. The titles to the lands occupied by the various tribes vested in the respective tribes, and not in the individual members. Cherokee Nation v. Journeycake, 155 U. S. 196, 15 Sup. Ct. 55, 39 L. Ed. 120; Shulthis v. MacDougal (C. C.) 162 Fed. 331. The work of the committee was first to determine who were the members of the tribes, and then to effect a division or allotment of the lands among them.

Agreements were entered into with the various tribes, pursuant to which this allotment of lands was made. In most instances the allottee took his land subject to restrictions upon alienation or incumbrance for a specified time; and it is the alleged sales or other disposition of such lands by the allottee before the expiration of the restriction period that has given rise to most of the suits now being considered. Their purpose is to restore to him the possession, where he is not now in possession, and to cancel and annul, as a cloud upon the title, all instruments involved in such sales or disposition. It is clear, therefore, that the allottee himself is vitally interested in the relief sought. Are his personal status and his relations to the United States such that these suits may be maintained solely in the name of the United States?

As to his personal status, a pertinent inquiry is: Are the members of the Five Civilized Tribes citizens of the United States? At the time they were granted the land comprising the Indian Territory, and during all the years they held the same up to the time when Congress first took active steps to effect an allotment in severalty, they were not citizens of the United States. Elk v. Wilkins, 112 U. S. 99, 5 Sup. Ct. 41, 28 L. Ed. 643. In Act Cong. May 2, 1890, c. 182, § 43, 26 Stat. 99, establishing a United States Court in Indian Territory, it was provided that:

"Any member of any Indian tribe or nation, residing in the Indian Territory, may apply to the United States court therein to become a citizen of the United States, and such court shall have jurisdiction thereof and shall hear and determine such application, as provided in the statutes of the United States."

But few Indians availed themselves of this privilege.

In Indian Appropriation Act March 3, 1893, 27 Stat. 645, is found the following provision:

"The consent of the United States is hereby given to the allotment of lands in severalty not exceeding one hundred and sixty acres to any one individual

within the limits of the country occupied by the Cherokees, Creeks, Choctaws, Chickasaws and Seminoles; and upon such allotments the individuals to whom the same may be allotted shall be deemed to be in all respects citizens of the United States. And the sum of twenty-five thousand dollars, or so much thereof as may be necessary, is hereby appropriated to pay for the survey of any such lands as may be allotted by any of said tribes of Indians to individual members of said tribes; and upon the allotment of the lands held by said tribes respectively the reversionary interest of the United States therein shall be relinquished and shall cease."

In the general allotment act of 1887 (Act Feb. 8, 1887, c. 119, 24 Stat. 388) these Indians had been specifically excluded from its provisions. That act provided that those Indians receiving allotments under its terms should become citizens of the United States. Now, six years later, Congress, by the section just quoted, consents that the Five Civilized Tribes may allot lands in severalty to each of their members, as they may deem proper, and upon such allotment extends to such allottees the right of United States citizenship in all respects.

Section 16 of the same act provides for the Commission to the Five Civilized Tribes, to enter into negotiations with the tribes for the purpose of the extinguishment of the national or tribal title to their lands and the allotment of the same in severalty to the individual members, with the view to such an adjustment upon the basis of justice and equity as met with the consent of such nations or tribes of Indians, so far as may be necessary, requisite, and suitable to enable the ultimate creation of a state or states of the Union, which shall embrace the lands within said territory. The consent to allotment expressed by Congress in section 15 was necessary, because under the grants conveying these lands to the tribes they could only be held by the Indians in their tribal capacity until such time as Congress should consent to a different holding. Sections 15 and 16 should be construed together. The purpose of Congress, as repeatedly expressed in this act, was to make an equitable division of the tribal or communal property, both personal and real, among the individual members of the tribes, to the end that a state might be formed. To do this the title had to be changed from tribal to individual, and Congress cleared the way for such distribution of property by consenting thereto. The tribes were then free to make such division, should they desire to do so, and it was the office of the Commission to endeavor to procure their consent to do so. The motive of Congress was to secure ultimate statehood, of which state the Indians should be citizens.

It is, of course, presumed that Congress in this legislation had in view what it conceived to be the greatest good to all concerned. It was not disposed to force statehood upon these people, even if it could have done so. But it could and did take the lead in the two very important steps looking to statehood, that of consenting to allotment and extending to allottees the privileges and immunities of United States citizenship. This was in 1893. It is now a matter of common knowledge that the Commission experienced many difficulties in reaching agreements with the tribes and much delay followed. It developed that it had a work of much more magnitude than had first been contemplated, and from time to time Congress enlarged its scope, and by successive acts provided more in detail for the accomplishment of

allotment and division of the lands. In 1901 its work was still unfinished; in fact, it was then just well begun. As yet but few of the Indians had taken their allotments, and, as these were not taken under the scheme provided by the act of 1893, it is doubtful whether they thus became citizens. By Act Cong. March 3, 1901, c. 868, 31 Stat. 1447, section 6 of the general allotment act of 1887 was amended by inserting the words "and every Indian in Indian Territory," so that the portion of the act relating to citizenship read:

"And every Indian born within the territorial limits of the United States, to whom allotments shall have been made under the provisions of this act, or under any law or treaty, and every Indian born within the territorial limits of the United States who has voluntarily taken up, within said limits, his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, and every Indian in Indian Territory is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States, without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property."

Section 8 of the act of 1887, as originally passed, read as follows:

"That the provisions of this act shall not extend to the territory occupied by the Cherokees, Creeks, Choctaws, Chickasaws, Seminoles, and Osage, Miamies, and Peorias, and Sacs and Foxes, in the Indian Territory, nor to any of the reservations of the Seneca Nation of New York Indians in the state of New York, nor to that strip of territory in the state of Nebraska adjoining the Sioux Nation on the south added by executive order." 1 Kappler's Laws, 35.

It is contended that the amendment of 1901 made the act ambiguous and contradictory. It must be presumed that Congress had in mind all the terms of the act that was amended. It is clear that Congress meant to say, and did say, by the amendment:

"Every Indian in Indian Territory is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, * * * without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property."

The language is clear, and its intent and meaning cannot well be mistaken, and if, in the other parts of the act as originally passed, there are found provisions in conflict with the clear purpose and intent of the amendment, they are in my judgment, so far as they conflict with the amendment, repealed by implication; but attention is called to the fact that section 6 was again amended by Act May 8, 1906, c. 2348, 34 Stat. 182. It is clear that the main purpose of this amendment was to provide that the allottee under the general allotment act of 1887 should not become a citizen of the United States upon delivery of the trust patent, but that such citizenship should be deferred until delivery of patent in fee simple. It is also observed that the words "and every Indian in Indian Territory," constituting the amendment of 1901, are omitted, and the section as amended is made to include this provision:

"And provided, further, that the provisions of this act shall not extend to any Indians in the Indian Territory."

At the same session, and only a few days before, Congress had passed an act providing for the final disposition of the affairs of the Five Civilized Tribes in Indian Territory, and was then considering the Oklahoma enabling act (Act June 16, 1906, c. 3335, 34 Stat. 267), which was passed shortly afterwards. It was natural, therefore, that, having specially legislated for the Five Civilized Tribes, they should, in amending this general allotment act, exclude therefrom all reference thereto. But the status of United States citizenship had attached to the individuals of the Five Civilized Tribes by the amendment of 1901. Without determining whether Congress could, without the consent of a citizen of the United States and without an act on his part forfeiting the same, withdraw such citizenship, it will not be presumed that Congress even intends to do so, except where such intent is expressed in clear and unmistakable terms; and in my judgment the amendment of 1906 does not admit of such construction.

On June 16, 1906, Congress passed the Oklahoma enabling act (Act June 16, 1906, c. 3335, 34 Stat. 267), in the preamble of which it is described as:

"An act to enable the people of Oklahoma and the Indian Territory to frame a constitution and state government, and be admitted into the Union on an equal footing with the original states."

In this act it was further provided:

"That the inhabitants of all that part of the area of the United States now constituting the territory of Oklahoma and the Indian Territory, as at present described, may adopt a constitution and become the state of Oklahoma, as hereinafter provided."

And in that act it was further provided:

"That all male persons over the age of twenty-one years, who are citizens of the United States, or who are members of any Indian nation or tribe in said Indian Territory and Oklahoma, and who have resided within the limits of said proposed state for at least six months next preceding the election, are hereby authorized to vote for and choose delegates to form a constitutional convention for said proposed state; and all persons qualified to vote for said delegates shall be eligible to serve as delegates."

Whether the Indians of the Five Civilized Tribes at the time of the passing of the enabling act were citizens of the United States or not, its terms clearly make them electors and give them the right to participate in the formation of the state Constitution and state government, if they were inhabitants of the area in the proposed state and are members of Indian nations or tribes. In fact, several of them were members of the constitutional convention. The Constitution framed pursuant to the enabling act provided that the qualified electors of the state shall be male citizens of the United States, male citizens of the state, and male persons of Indian descent native of the United States, who are over the age of 21 years, etc. Upon submission of the Constitution, as provided in the enabling act, the President of the United States proclaimed statehood. The members of the Five Civilized Tribes participate in all state, county, and municipal elections, hold state and county offices, a member of the Chickasaw Nation is now a representative in Congress, and a member of the Cherokee Nation

is now a United States Senator from Oklahoma. In Boyd v. Thayer, 143 U. S. 170, 12 Sup. Ct. 385 (36 L. Ed. 103) it is said:

"Admission on an equal footing with the original states, in all respects whatever, involves equality of constitutional right and power, which cannot thereafterwards be controlled, and it also involves the adoption as citizens of the United States of those whom Congress makes members of the political community, and who are recognized as such in the formation of the new state with the consent of Congress."

In my judgment, therefore, the members of the Five Civilized Tribes are citizens of the United States, with all the rights, privileges, and immunities of citizenship. I am not unmindful of the fact that Congress, by joint resolution of March 2, 1906 (34 Stat. 822), continued the tribal governments "in full force and effect for all purposes under existing laws, until all property of such tribes, or the proceeds thereof, shall be distributed among the individual members," and that by act of Congress approved April 26, 1906 (34 Stat. 137, c. 1876) tribal existence was "continued in full force and effect for all purposes authorized by law until otherwise provided by law." But by various and successive acts of Congress these tribes have been shorn of their governmental functions. Their courts have long been abolished. Their principal chief, or governor, as the case may be, is subject to removal by the President, who may fill the vacancy by appointment. Provision is made that their public school system shall be superseded by the state public school system. Tribal tax is abolished. Provision is made for the sale of their public buildings and lands. Their Legislature shall not be in session for a longer period in any one year than 30 days, and no act, ordinance, or resolution thereof, except resolutions of adjournment, are valid without approval by the President. In Buster v. Wright, 135 Fed. 951, 68 C. C. A. 509, Judge Sanborn said:

"Between the years 1888 and 1901 the United States by various acts of Congress deprived this tribe [Creeks] of all its judicial power and curtailed its remaining authority until its powers of government have become the merest shadows of their former selves."

So it is with all the Five Civilized Tribes; but there is still undistributed tribal property, and until this is divided it is essential that the tribal entity shall be maintained. In my judgment, the existence of this undistributed tribal property was the main reason for continuing the tribal existence, and such must have been the principal motive actuating Congress when the resolution of March 2, 1906, was passed, providing for the continuance of tribal existence "until all property of such tribe, or the proceeds thereof, shall be distributed among the individual members of said tribe." It is a continuance of the tribe in mere legal effect, just as in many states corporations are continued as legal entities after they have ceased to do business, and are practically dissolved, for the purpose of winding up their affairs. It is not, in my judgment, a tribal existence incompatible with the enjoyment of full citizenship in the United States by the members of the tribes. Nor does the fact that these Indians have had restrictions upon alienation imposed upon their allotments necessarily affect their

political status as United States citizens. In re Heff, 197 U. S. 508, 25 Sup. Ct. 506, 49 L. Ed. 848.

Can the right to maintain these suits be based upon treaty provisions relating to the protection of these Indians in their possession of the lands originally granted to the tribe? The grants of land made under Act Cong. May 28, 1830, c. 148, 4 Stat. 411, and the treaties entered into pursuant thereof, were to the tribes as such, and not to the individual members. This is clear from the fact, as we have seen, that it was then contemplated that these lands were so remote that they would never be desired for white settlement. It was then the policy of the government to perpetuate the existence of the tribe, and there was no thought of tribal dissolution and the individual holding of the land. The guaranties in the treaties related to tribal protection, and in my judgment cannot be invoked by the individual allottee under the changed conditions now existing. They imposed no duty or obligation upon the United States upon which these suits may be based.

The trust relation of the government, recognized in Beck v. Flournoy Co., 65 Fed. 30, 12 C. C. A. 497, and kindred cases, known as the "Flournoy Cases," as arising from the fact that the legal title to the lands there involved was still retained in the government, does not exist here. It is alleged that by reason of the duties, obligations, and rights of the government, as set forth in this bill, the government is charged with the duty of protecting in the courts the rights of the said tribes and members thereof, and in their behalf is charged with a trust of a high and delicate character. This is but a repetition of the allegation of guardianship, and we have now to consider whether, in view of existing legislation and the present status of the individual allottee of either of the Five Civilized Tribes, these suits may be maintained by the United States as guardian for the Indian, acting in his stead and without making him a party.

Does the relationship of guardian and ward now exist between the United States and the allottee with reference to his restricted land, in the sense originally recognized as existing between the United States and the tribe and members thereof with reference to tribal property? The theory upon which this relation of guardianship arose and was recognized for so many years is well stated in United States v. Kagama, 118 U. S., at page 383 et seq., 6 Sup. Ct. 1114 (30 L. Ed. 228), as follows:

"These Indian tribes are the wards of the nation. They are communities dependent on the United States; dependent largely for their daily food; dependent for their political rights. They owe no allegiance to the states, and receive from them no protection. Because of the local ill feeling, the people of the states where they are found are often their deadliest enemies. From their very weakness and helplessness, so largely due to the course of dealing of the federal government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the Executive and by Congress, and by this court, whenever the question has arisen. * * * The power of the general government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it has never existed anywhere else, because the theater of its exercise is within

the geographical limits of the United States, because it has never been denied, and because it alone can enforce its laws on all the tribes."

It is evident the court has in mind tribal Indians, "communities dependent upon the United States; dependent largely for their daily food; dependent for political rights." They owed no allegiance to the states, and received from them no protection. To this class of Indians the court says there arises the duty of protection, and with it the power. Congress and the courts have long recognized the relation of guardianship in such cases, and such relation was recognized as existing over the Five Civilized Tribes before allotment, and in my judgment so exists now with reference to tribal property. Choctaw Nation v. United States, 119 U. S. 1, 7 Sup. Ct. 75, 30 L. Ed. 306.

The relation of guardianship is not established by Congress expressly saying in any particular act, "The United States is hereby declared to be the guardian of the Indians," but was deduced by the courts, from a consideration of natural conditions and constitutional and legislative provisions, as being that most nearly approaching the peculiar relation existing between the United States and the Indian tribes when the matter was first presented for judicial consideration (Cherokee Nation v. Georgia, 5 Pet. 1, 8 L. Ed. 25), and, of course, recognized as continuing so long as the conditions giving rise to it existed. But Congress may terminate this relation at any time. As said Mr. Justice Brewer, in the Heff Case, 197 U. S. 499, 25 Sup. Ct. 508, 49 L. Ed. 848:

"Of the power of the government to carry out this policy there can be no doubt. It is under no constitutional obligation to perpetually continue the relationship of guardian and ward. It may at any time abandon its guardianship and leave the ward to assume and be subject to all the privileges and burdens of one sui juris. And it is for Congress to determine when and how that relationship of guardianship shall be abandoned. It is not within the power of the courts to overrule the judgment of Congress. It is true there may be a presumption that no radical departure is intended, and courts may wisely insist that the purpose of Congress be made clear by its legislation; but when that purpose is made clear the question is at an end."

Whether the relation is now terminated, or materially changed, by Congress, we are to determine from a consideration of recent legislation and changes wrought thereby. As the relation was not established by any express provision, neither is it necessary to its termination. These allottees are now citizens of the United States and citizens of the state of Oklahoma. Slaughter House Cases, 16 Wall. 36, 21 L. Ed. 394. As such they have the right to make and enforce contracts, to sue, be parties, give evidence, and to inherit, purchase, lease, sell, and convey property. Civil Rights Cases, 109 U. S. 1, 3 Sup. Ct. 18, 27 L. Ed. 835. The fact that the allottee holds land all or a part of which is inalienable for a fixed period does not affect his civil or political status. In re Heff, supra. Nor does it follow that, because as a citizen he may make contracts generally with reference to his property, he may therefore dispose of restricted lands before the expiration of the restricted period. Flournoy Cases, supra.

In 19 Opinions of Attorneys General, at page 232, Mr. Garland said of the effect of the general allotment act of 1887, whereby in-

dividual allottees were given the right of occupancy of separate tracts, the title to which the government held in trust for 25 years:

"In this new mode of life, the guardianship which heretofore has been exercised over the tribe is to be transferred to the individual allottees provided for in this act. * * * Prior to the issuing of the second patent, the United States is to act as trustee of the lands. This relation as to the lands is substituted for the guardianship heretofore exercised over the tribe."

United States v. Dooley (C. C.) 151 Fed. 697, was a recent case instituted in the United States Circuit Court, Eastern District of Washington, by the government in its own behalf to cancel a deed made by Susan Swasey, an allottee holding a trust patent, to the other defendants. The allottee, Susan Swasey, is made a party defendant. Concerning the relation of the allottee to the government the court says:

"The contention that the relation of guardian and ward exists between the complainant and the allottee cannot be sustained, for the statute terminated that relation, at least in so far as it affects her personal acts and political status as an Indian. Such was the holding in the Matter of Heff, 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 848. The argument that the same relation exists between the government and the Indians since as before the passage of the act was answered by Mr. Justice Brewer in delivering the opinion of the court, as follows: 'But the logic of this argument implies that the United States can never release itself from the obligation of guardianship; that, so long as an individual is an Indian by descent, Congress, although it may have granted all the rights and privileges of national and therefore state citizenship, the benefits and burdens of the laws of the state, may at any time repudiate this action and reassume its guardianship, and prevent the Indian from enjoying the benefit of the laws of the state, and release him from obligations of obedience thereto. Can it be that, because one has Indian and only Indian blood in his veins, he is to be forever one of a special class over whom the general government may in its discretion assume the rights of guardianship which it had once abandoned, and this whether the state or the individual himself consents? We think the reach to which this argument goes demonstrates that it is unsound.' The right to maintain the suit must therefore rest on other grounds than that of the relation of guardian and ward; but it does not follow that, because such status has been abolished, the government is remediless. The authority rests upon another well-defined principle. The complainant is still vested with the legal title to the land," etc.

In Ex parte Savage (C. C.) 158 Fed. 205, Judge Pollock, of the Kansas district, said:

"Since the decision by the Supreme Court in the case of In re Heff, 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 848, * * * it cannot be doubted, I think, under act of Congress of February 8, 1887, * * * when Indians have been allotted in severalty and have received their patent, they are no longer wards of the government, but are citizens of the United States and of the state in which they reside, and are entitled to all the rights guaranteed to citizens of such state."

In the act of 1887, not only were the allottees restricted from selling the lands, but the legal title thereto was reserved in the United States during the restriction period. The allottees herein involved are restricted from selling for a fixed period, but the title is not reserved. Certainly, if in the former case the relation of guardian and ward does not exist, it does not in the latter, unless for some other reason. Had it been the desire of Congress and the Five Civilized Tribes that the trust relation provided in the general allotment act

should prevail here, it could readily have been accomplished by providing that the title should be held in trust by the tribe for the restricted period, to be finally patented to the allottee free from incumbrance, etc. The trust relation of the tribe and the unquestioned right of the government to control tribal property would, in my judgment, have entitled the United States to sue in behalf of the tribe to cancel any conveyance made by the allottee. This, of course, would have involved the continuation of the tribe in legal effect during the restriction period, or until other disposition of the trust was provided, and it is probable that, if such a disposition of the matter was considered, it was not adopted, because of the desire to sooner abolish tribal existence. It is to be remembered that the act of 1893 (27 Stat. 645) contemplated the extinguishment of the tribal title, either by cession to the United States or by allotment to the individual Indians. Had the former been done, then allotment could have been effected similar to that under the act of 1887; but this was not done. The restrictions upon alienation were placed upon these lands for some purpose, however. Let us see what it was. In Beck v. Flournoy Company, 65 Fed. 34, 12 C. C. A. 501, Judge Sanborn says:

"The motive that actuated the lawmaker in depriving the Indians of power of alienation is so obvious, and the language of the statute in that behalf is so plain, as to leave no room for doubt that Congress intended to put it beyond the power of white men to secure any interest whatsoever in lands situated within Indian reservations that might be allotted to Indians."

Speaking of restricted allotments under the general act, Judge Phillips says, in Goodrum v. Buffalo, 162 Fed. 817, 89 C. C. A. 525:

"Accordingly, while authorizing the allotments in severalty, Congress conceded the lands with a firm cable attached to hold them to the exclusive use and possession of the Indians without qualification, restricting the power of divesting themselves of the use and title until after the fixed period."

There are numerous cases holding that the attempted conveyance of restricted allotted lands is void, and that the purchaser, even though he has paid the purchase price, does not secure even an equitable title; nor can title be built up by adverse possession, estoppel, or any statute of limitations. Clark v. Akers, 16 Kan. 166; Sheldon v. Donohoe, 40 Kan. 346, 19 Pac. 901; Schrimpscher v. Stockton, 183 U. S. 295, 22 Sup. Ct. 107, 46 L. Ed. 203; Beck v. Flournoy Company, 65 Fed. 30, 12 C. C. A. 497; Harris v. Hardridge (C. C. A.) 166 Fed. 109; Goodrum v. Buffalo, 162 Fed. 817, 89 C. C. A. 525. In the Buffalo Case, last cited, Judge Phillips says:

"There is but one opinion among the courts, with the single exception of the ruling in said United States Court of the Indian Territory, as to the construction of such acts of Congress and patents made thereunder, and that is that any and all schemes and devices resorted to for the purpose of acquiring title to the Indian allotments, during the period of such limitation, are abortive: and this for the palpable reason that it is a period of absolute disability on the part of the Indian to alienate his lands."

It follows that, in any case wherein an allottee has been induced to dispose of any of his restricted land contrary to the laws under which it was set apart to him, he may, if the pretended purchaser has gone into possession, bring suit in ejectment and recover the same, and no

rights accrue to the defendant in such case by virtue of such transaction which he can interpose as a defense. If in such case the allottee is still in possession, he can successfully defend against a suit brought by such pretended purchaser to secure possession by virtue of such pretended conveyance. He can, in short, institute and maintain any action in relation to his restricted land which any other citizen might prosecute in relation to real property, and no deed, mortgage, lease, contract of sale, power of attorney, or other instrument or conveyance made by such allottee regarding his restricted land, contrary to the tribal agreements and acts of Congress relating thereto, can be legally urged as a defense to such action. As said by Judge Phillips in the Buffalo Case, supra:

"It should be understood, once for all, that no scheme or device, however ingenious or plausible, concocted by any person, can avail to divest the Indians of the title to their allotted lands within the period of limitation prescribed by Congress."

Having given the allottee the right of citizenship and clothed him with these unusual safeguards against his improvidence, has Congress, in addition thereto, by the mere fact of placing restrictions upon alienation of the land, intended thereby to reserve to the United States the right to sue in its own name to set aside such illegal transactions, and to recover for the allottee such restricted property? If such right is reserved to the government, and we are correct in the conclusion that the allottee is a citizen and may also maintain an action for the same purpose, then we have an anomalous condition under which, while the government suit is pending in this court, the allottee, who is not a party here, if he sees fit, may go into the state court and sue the same defendant for the same relief. What rule of law is there binding the allottee by the suit in this court, to which he is not a party, even though it be professedly for his benefit? My attention is called to none, nor do I know of any. Suppose a final decree is rendered in this court against the government with regard to any particular allotment, and suppose thereafter the allottee proceeds to bring suit in his own name against the same defendant or defendants, for identically the same cause of action and seeking identically the same relief; can these defendants plead as a defense in that suit the decree rendered here in a case to which the allottee was not a party? It is certainly extremely doubtful. In my judgment, the purpose of Congress to establish such an extraordinary condition as this must appear very plainly to warrant a court in arriving at such a conclusion. In United States v. Paine Lumber Company, 206 U. S., at page 473, 27 Sup. Ct. 699, 51 L. Ed. 1139, it is said:

"The restraint upon alienation must not be exaggerated. It does not of itself divest the right below a fee."

It must be borne in mind that the cardinal purpose of Congress was the creation of a state, of which the Indians were to be citizens. Continued guardianship of the Indians was incompatible with citizenship, national and state. In my judgment, when Congress clothed the allottee with full citizenship, and to provide against his improvidence vested in him title to his inalienable land, so that no scheme nor de-

vice, however ingenious, could divest him thereof, it did so for the very reason that in carrying out the original plan of statehood, which was to include the Indian, his status as ward of the government was not in the nature of things compatible with full citizenship in the state and union, and that it was not intended by Congress that the guardianship should longer continue. United States v. Auger (C. C.) 153 Fed. 671.

By this I do not mean to say that Congress may not make any law or regulation respecting such Indians, their lands, property, or other rights, by treaties, agreement, law, or otherwise, which it would have been competent to make if statehood had not ensued; for it reserved that right in the enabling act. But we are not now concerned with what Congress may do, but what it has done. I am not unmindful of the act of March 3, 1905, and subsequent acts relative thereto. By Act March 3, 1905, c. 1479, 33 Stat. 1060, it is provided:

"It shall be the duty of the Secretary of the Interior to investigate, or cause to be investigated, any lease of allotted land in the Indian Territory which he has reason to believe has been obtained by fraud, or in violation of the terms of existing agreements with any of the Five Civilized Tribes, and he shall in any such case where in his opinion the evidence warrants it, refer the matter to the Attorney General for suit in the proper United States court to cancel the same, and in all cases where it may appear to the court that any lease was obtained by fraud or in violation of such agreement, judgment shall be rendered canceling the same upon such terms and conditions as equity may prescribe, and it shall be allowable where all parties in interest consent thereto to modify any lease and to continue the same as modified: Provided, no lease made by any administrator, executor, guardian, or curator which has been investigated by and has received the approval of the United States court having jurisdiction of the proceeding shall be subject to suit or proceeding by the Secretary of the Interior or Attorney General."

Act March 1, 1907, c. 2285, 34 Stat. 1026, contains this provision:

"To enable the Secretary of the Interior to investigate or cause to be investigated any lease of allotted land in the Indian Territory which he has reason to believe has been obtained by fraud or in violation of the terms of existing agreements with any of the Five Civilized Tribes, as provided by the act approved March third, nineteen hundred and five, ten thousand dollars."

Act April 30, 1908, c. 153, 35 Stat. 90 (Indian appropriation act), also provided:

"To enable the Secretary of the Interior to investigate or cause to be investigated any lease, power of attorney, contract, deed, or agreement to sell any allotted land which he has reason to believe has been obtained by fraud, or in violation of the terms of existing agreements with any of the Five Civilized Tribes, as provided by the act approved March third, nineteen hundred and five, ten thousand dollars."

This act is a legislative declaration that in 1905, before it was passed, no duty devolved upon the Secretary to supervise the allottee in the leasing of his land, except where the law specifically provided that such lease should be subject to his approval. In Beck v. Flournoy Company, supra, Judge Thayer said:

"It is manifest that the amendment in question, authorizing allotted land to be leased in certain cases under the direction of the Secretary of the Interior, was unnecessary, if power to execute leases of allotted lands had already been conferred by previous enactments or treaty stipulation. The last-mentioned act, therefore, is a legislative declaration that Congress did not in-

tend by any previous statute to authorize the leasing of any lands that might be assigned to Indians to be held by them in severalty."

But the Secretary of the Interior is charged with the supervision of all Indian matters wherein the government still retains guardianship, and this duty would have existed without legislation, if at that time the government still retained the guardianship of the allottee with regard to the land covered by the lease referred to. It is noted, further, that the matter is to be referred to the Attorney General for suit in the proper United States court, and in the proviso they are referred to as suits or proceedings by the Secretary of the Interior or the Attorney General. Whatever may have been the status of the allottee in 1905, it is clear that, in a suit now instituted under this provision to cancel or modify a lease, the allottee is a necessary party, first, because he is one of the main parties in interest, and for reasons heretofore adverted to is necessary to a complete determination of the controversy; and, second, because as one of the parties in interest his consent to any modification of the lease as provided for is necessary.

While the appropriation of April 30, 1908, is made to cover investigation by the Secretary of powers of attorney, deeds, or agreements to sell any allotted land, in addition to the leases, provided for in the original act and other appropriation acts, the act refers in terms to the original act, which provides only for suits by the Attorney General regarding leases. There is nothing in this legislation which, in my judgment, authorizes the government to maintain the suits at bar independent of the allottee and without making him a party. It follows that in the present bills there is a defect of parties.

It is urged that, even though the complainant may have the capacity to maintain these suits, the bills are subject to the objection of multifariousness, because numerous defendants are joined in each bill, for the reason that they are alleged to be connected with many distinct transactions regarding as many distinct tracts of land. A bill is said to be multifarious when it improperly joins distinct and independent matters, and thereby confounds them, as, for example, the uniting in one bill of several matters perfectly distinct and unconnected against one defendant, or the demand of several matters of a distinct and independent nature against several defendants in the same bill. Words and Phrases, vol. 5, p. 4616. In Barcus v. Gates, 89 Fed. 783, 32 C. C. A. 337, it is said:

"Multifariousness arises from the fact either that the transactions which form the subject-matter of the suit are so separate and dissimilar that they cannot conveniently be tried in one record, or that one defendant is able to say that as to a large number of the transactions set out in the bill he has no interest or connection whatever. A bill is not multifarious because there are several causes of action. If they occurred out of the same transaction, and if all the defendants are interested in the same rights and the relief against each is of the same general character, the bill may be sustained."

In Hale v. Allinson, 188 U. S. 56, 23 Sup. Ct. 244, 47 L. Ed. 380, the suit of a receiver against numerous stockholders to enforce their liability, the court approves and adopts the opinion of District Judge McPherson in the lower court. While that discusses the question of multiplicity of suits, rather than multifariousness, the opinion is very

pertinent to the situation here. In the course of the opinion, it is said:

"If as is sure to happen, different defenses are put in by different defendants, the bill evidently becomes a single proceeding only in name. * * * But even if the grounds of diminished trouble and expense may seem to be sufficient, I should still be much inclined to hesitate before I conceded the superiority of the equitable remedy in the present case. Such a bill as is now before the court is certain to be the beginning of a long and expensive litigation. The hearings are sure to be protracted. Several, perhaps many, counsel will no doubt be concerned, whose conveniences must be consulted. The testimony will soon grow to be voluminous. The expense of printing will be large. The cost of witnesses will not in any degree be diminished, and, if some docket costs may be escaped, that is probably the only pecuniary advantage to be enjoyed by this cumbersome bill over separate actions at law."

Suppose the court were to retain jurisdiction of these bills, and require that the allottees all be made parties, either as plaintiffs or defendants. The bill would then essentially involve a multitude of separate suits, each by an allottee, the main party in interest, as plaintiff, and one or more, but not all, of the defendants, as defendants. I appreciate fully the motive of the pleaders, who conceived that the government was the only necessary plaintiff, so that each bill would be merely the suit of one plaintiff against various defendants, and, conceiving that each bill involved practically but one question of law, in the determination of which all the defendants were equally interested, deemed it most practical to institute one suit instead of many. But to my mind these bills, viewed from any standpoint consistent with the facts and conditions involved, each essentially combine a multitude of separate and distinct causes of action, by separate and distinct plaintiffs, against separate and distinct defendants, and are subject to the objection of multifariousness.

There are other grounds of objection raised by the demurrers not necessary now to consider. For the reasons set forth in this opinion, the demurrers, in my judgment, should be sustained, and the bills dismissed.

It is so ordered.